**In re PAINEWEBBER LIMITED PARTNERSHIPS LITIGATION.**

**This Document Relates To All Actions.**

This Document Also Relates To (But is not Filed in) The Coordinated Action Neidich et al. v. Geodyne Resources Inc. et al. No 94–052860, Pending in the District Court of Harris County, Texas.

No. 94 Civ. 8547(SHS).

United States District Court, S.D. New York.

March 20, 1997.

*OPINION AND ORDER*

STEIN, District Judge.

The plaintiff class has moved, pursuant to Fed.R.Civ.P. 23(e), for final approval of the settlement of this class action on the terms set forth in the Stipulation and Agreement of Compromise and Settlement (the "Settlement Agreement") executed by the parties on July 11, 1996. By its Order dated July 17, 1996, this Court granted preliminary approval of the Settlement Agreement as "fair, reasonable and adequate," set a date for a hearing on whether the terms of the Settlement Agreement were fair, reasonable and adequate, and directed Class Counsel to provide notice to the Class. In August of 1996, Class members were notified by mail and newspaper publication of the terms of the Settlement Agreement, including the proposed Plan of Allocation, the proposed award of attorneys' fees, and the date and purpose of the fairness hearing. Objections were subsequently filed by members of the Class

and arguments were presented at a fairness hearing before this Court on October 25 and November 8, 1996, at which testimony was taken and legal arguments heard. On the basis of all the evidence and arguments submitted, and for the reasons set forth below, the proposed Settlement and Plan of Allocation are determined to be fair, reasonable and adequate, and accordingly are hereby approved pursuant to Fed.R.Civ.P. 23(e). The award of attorneys' fees and litigation expenses is not decided in this Opinion and Order and will be the subject of a separate Order.

## I.

## FACTS

### A. *Introduction*

The Settlement Agreement submitted here for approval applies to two distinct but related consolidated lawsuits: the Consolidated Complaint now pending in this Court known as *In Re PaineWebber Limited Partnerships Litigation* (Master File No. 94 Civ. 8547) ("Federal Action"), and the Consolidated Petition currently pending in the District Court of Harris County, Texas, under the caption *Neidich. et al. v. Geodyne Resources, Inc., et al.,* No. 94–052860 ("Texas Action"). Both the Federal and Texas Actions are comprised of multiple litigations and have previously been certified as class actions; they have proceeded on a coordinated basis in this Court during much of the discovery process and throughout the negotiation of the Settlement Agreement.

The plaintiff class in the Federal Action is composed of investors who purchased shares in one or more of 70 limited partnerships and investment trusts ("Partnerships") which were organized, marketed and operated by PaineWebber. (*See* Class Plaintiffs' Memorandum in Support of Approval ("Class Mem.") at 1.) The plaintiff class in the Texas Action, which is entirely encompassed within the Federal Class, is composed of investors who purchased units in 23 of the 29 Geodyne limited partnerships ("Geodyne Units") marketed by PaineWebber. (*See* Notice of Proposed Class Action Settlement ("Settlement Notice") at ¶¶ 4–5.) Unless otherwise noted, the Federal and Texas Classes will be referred to collectively as "the Class," and their members as "Class Members." The defendants in the Federal and Texas Actions are PaineWebber Group, Inc., PaineWebber Incorporated, Ltd., and certain PaineWebber subsidiaries, affiliates and individual officers; they will be referred to collectively as "PaineWebber" or "the Defendants." Defendants and the Class will be referred to together as "the Parties." Finally, certain counsel have been designated by the Texas Court or by this Court to act as Executive Committees on behalf of their respective classes in the Texas and Federal Actions; unless otherwise noted, these counsel will be referred to collectively as "Class Counsel."

The members of the Federal Class have alleged, among other claims, that PaineWebber sold them risky and illiquid Partnerships in an effort to maximize its own fees and commissions, and engaged in a conspiracy to misrepresent those Partnerships as safe investments suitable for most investors. The Federal Class seeks relief pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), federal securities law, and the common law. The members of the Texas Class have alleged, among other claims, that PaineWebber defrauded them by failing to disclose the true nature of the risks presented by the Geodyne partnerships, and by misrepresenting the likely benefits of those investments. They seek relief under the statutes and common law of Texas. The Defendants deny all allegations of wrongdoing and liability. (*See* Settlement Notice at ¶¶ 4–6.)

On July 11, 1996, PaineWebber and Class Counsel reached an agreement to settle these consolidated class actions, pending approval by this Court. The proposed Settlement would provide a cash recovery of $125 million, plus a variety of "Additional Benefits"—such as guarantees and fee waivers—which the parties assert to be worth at least $75 million. The stated objective of the Settlement is to allow all Class Members to recoup as much of their lost capital investments as possible, and accordingly the settlement proceeds are to be allocated to Class Members pro rata on the basis of "Recog-

nized Loss," a defined term in the proposed Settlement. (*See infra* Section I.) Payments will not be weighted to reflect possible differences in the relative strength of Class members' claims on the merits. (*See* Class Mem. at 48–51.)

This Opinion and Order sets forth the material facts underlying the Settlement of these class actions, and addresses the legal issues—including those issues that have been raised by objecting Class Members—that are relevant to the determination of the Settlement's fairness, reasonableness and adequacy.

## B. *Background of the Federal Action*

Between November 23, 1994 and January 4, 1995, 10 lawsuits were filed in this District by individual plaintiffs against PaineWebber, alleging claims arising from the marketing and sale of the Partnerships and requesting certification as class actions.[1] Shortly thereafter, Judge Charles S. Haight, Jr. of this Court consolidated those actions[2] for pretrial purposes under the caption *In re Paine-Webber Limited Partnerships Litigation,* Master File No. 94 Civ. 8547; approved the formation of plaintiffs' counsel into an Executive Committee; and set schedules for the filing of a Consolidated Complaint and for discovery. (*See* Case Management Orders 1 and 2, dated March 3 and 16, 1995.)

On March 27, 1995, eighteen plaintiffs, on behalf of all those similarly situated, filed a First Consolidated Amended Class Action Complaint ("Complaint") in this Court against PaineWebber Group, Inc., Paine-Webber Incorporated ("PWI"), various PaineWebber subsidiaries and affiliates, and three individual corporate officers.[3] The Complaint alleges that between 1980 and 1992, PaineWebber developed, marketed and operated numerous investment Partnerships as part of an ongoing conspiracy to defraud investors and enrich itself through excessive fees and commissions. Specifically, the Complaint asserts that the 70 Partnerships, which include limited partnerships in oil and gas, aircraft leasing and research and development, as well as real estate investment trusts (REITs) and other entities,[4] were falsely and

1. *Rittmaster v. PaineWebber Group, Inc., et al,* No. 94 Civ. 8547; *Schwartz. et al. v. PaineWebber Group, Inc.,* No. 94 Civ. 8549; *Romine v. PaineWebber Group. Inc. et al,* No. 94 Civ. 8558; *Tiefer v. PaineWebber Group, Inc.,* No. 94 Civ. 8609; *Fine, Bryant & Wah P.T. Chartered Profit Sharing Trust v. PaineWebber Group, Inc.,* No. 94 Civ. 8637; *Clark v. PaineWebber Group, Inc.,* No. 94 Civ. 8712; *Nassirzadeh v. PaineWebber Group, Inc.,* No. 94 Civ. 8762; *Williams v. PaineWebber Group, Inc.,* No. 94 Civ. 8772; *McLeod v. PaineWebber Group, Inc., et al.,* No. 94 Civ. 8934; and *Sanfilippo v. PaineWebber Group, Inc.,* No. 95 Civ. 0056.

2. Three additional cases—*Danziger v. PaineWebber Group, Inc.,* No. 95 Civ. 3370; *Paulson v. PaineWebber Group, Inc.,* No. 95 Civ. 4570; and *Beckwith v. PaineWebber, Inc.. et al.,* No. 95 Civ. 7755 (September 8,1995)—have since been added to the Consolidated Complaint.

3. *See* Complaint at ¶¶ 50–112. The named individual defendants are: Joseph J. Grano, Jr. (President of Retail Sales and Marketing for PWI and a Director of PaineWebber); Paul B. Guenther (President of PWI and a Director of Paine-Webber); and Donald B. Marron (Chairman and CEO of PaineWebber, Chairman and CEO of PWI, and, at various times, President of PWI and Chairman of PaineWebber Properties, Inc.). (Complaint at ¶¶ 108–110.)

4. The 70 Partnerships are the following: Paine-Webber/Geodyne Energy Income Limited Part-nerships I–A through I–F; PaineWebber/Geodyne Energy Income Limited Partnerships II–A through II–H; PaineWebber/Geodyne Energy Income Limited Partnerships III–A through III–G; PaineWebber/Geodyne Inst/Pension Energy Income P–I through P–8 Limited Partnerships; Kagan Media Partners; PaineWebber CMJ Properties, L.P.; PaineWebber Development Partners IV, Ltd.; PaineWebber Equity Partners I through III Limited Partnerships; Fiduciary Capital Partners, L.P.; Fiduciary Capital Pension Partners, L.P.; PaineWebber Growth Properties I, L.P. and II, L.P.; PaineWebber Growth Partners III, L.P.; PaineWebber Guaranteed Futures Fund, L.P.; PaineWebber Income Properties Limited Partnership; PaineWebber Income Properties Two through Eight Limited Partnerships; Paine-Webber Independent Living Mtge. Fund, Ltd.; PaineWebber Independent Living Mtge. Inc., II; PaineWebber Insured Mortgage Partners IA L.P. and IB L.P.; PaineWebber IRB Property Fund Limited Partnership; PaineWebber Mortgage Partners V, L.P.; Participating Income Properties III Limited Partnership; PaineWebber Preferred Yield Fund, L.P.; PW Preferred Yield II, L.P.; PaineWebber Qualified Plan Property Fund, L.P.; PaineWebber Qualified Plan Property Fund Two, L.P. through Four, L.P.; Paine-Webber R & D Partners, L.P.; PaineWebber R & D Partners II, L.P. and III, L.P.; Realty Southwest Fund II, Ltd. and III, Ltd.; Retail Property Investors, Inc.; Pegasus Aircraft Partners, L.P.; Pegasus Aircraft Partners II, L.P.

indiscriminately promoted to the public by PaineWebber as low-risk investments, when in fact PaineWebber knew the opposite to be true. (Complaint at ¶¶ 10–20, 116–136.)

Defendants are alleged to have implemented their scheme through the use of "Uniform Sales Materials" and broker "scripts" which stressed the safety of the Partnerships and emphasized PaineWebber's experience, skill and trustworthiness in investigating and selecting high quality investment opportunities.[5] (Complaint at ¶¶ 131–132.) The Partnerships allegedly were marketed as acceptable investments for retirement funding and as alternatives to tax free bonds or certificates of deposit, and PaineWebber brokers allegedly were coached to promote the Partnerships regardless of each customer's investment objectives and without concern for the suitability of such investments. (Complaint at ¶¶ 18, 130–132.) It is also alleged that the marketing of the Partnerships was centrally orchestrated through the use of a uniform series of statements and sales materials, and that the same presentations were used nationwide for virtually all of the Partnerships regardless of the risk associated with the venture or the quality of the particular investment. (See Complaint at ¶¶ 12, 116, 118, 128; Affidavit of Nicholas Chimicles submitted in support of the settlement ("Chimicles Aff.") at ¶ 14.) Defendants are alleged to have known, and to have concealed from investors, that the Partnerships were not actually conservative investments, but were in fact highly speculative ventures, and moreover that it would be extremely unlikely, if not impossible, for these investments ever to attain their stated goals, particularly in light of PaineWebber's own substantial up-front fees and commissions. (Complaint at ¶ 136.)

The Complaint further alleges that PaineWebber deliberately circumvented the disclosure requirements of federal securities law by promoting the sale of Partnerships on the sole basis of summary Uniform Sales Materials, and actively discouraging brokers and investors from reading or referring to the Prospectuses. Brokers and prospective investors were allegedly told that the Uniform Sales Materials explained the legal language contained in the Prospectus, when in fact such Sales Materials allegedly glossed over or failed to disclose risks noted in the Prospectus. (Complaint at ¶¶ 138–139; Chimicles Aff. at ¶ 15.) Finally, it is alleged that in order to conceal their initial fraud, induce investors to purchase future offerings, and deceive investors about the true financial condition and performance of their investments, Defendants manipulated quarterly cash distributions and misreported data in investor reports and account statements, so as to make it appear for some time that the Partnerships were in fact meeting their projections. (Complaint at ¶¶ 141–143; Chimicles Aff. at ¶ 16.)

Count I of the Complaint asserts RICO claims pursuant to 18 U.S.C. § 1962(c) and (d); Count II asserts RICO claims pursuant to 18 U.S.C. § 1962(a) and (d); Count III asserts violations of Section 10(b) of the Securities and Exchange Act of 1934, and of Rule 10b–5 under that Act; Count IV asserts violations of Section 11 of the Securities Act of 1933; Count V asserts violations of Section 12 of the Securities Act. The remaining Counts allege common law fraud (Count VI), negligent misrepresentation (Count VII), breach of fiduciary duty (Count VIII), breach of third party contract against PWI (Count IX), and breach of implied covenants against PWI (Count X). (Complaint at ¶¶ 177–248; Chimicles Aff. at ¶ 17.)

By Order dated May 30, 1995, Judge Haight certified the Consolidated Complaint as a class action pursuant to Fed.R.Civ.P. 23(b)(3) in accordance with a prior stipulation of the parties. (See Stipulation and Order Regarding Class Certification dated May 30, 1995 ("Certification Order") at ¶ E, § 10.) The Federal Class consists of all persons and entities who purchased units in one or more of the Partnerships from or through PaineWebber between January 1, 1980 and December 31, 1992, and its representatives are the eighteen named plaintiffs in the Consoli-

---

5. For example, brokers were allegedly encouraged to promote the PaineWebber Insured Mortgage Partners Partnership as an investment that "eliminates the volatility of the stock market." (Complaint at ¶¶ 126–127.)

dated Complaint.[6] In accordance with Fed. R.Civ.P. 23(a), the Certification Order specified that the Federal Class satisfies all the requirements of class certification. Specifically, it provided that: (a) due to the large number of potential plaintiffs, joinder of class members individually would be impracticable; (b) there are numerous questions of law and fact common to the Class; (c) the Class representatives allegedly purchased Partnership interests in reliance on false representations by PaineWebber, and their claims for relief are typical of the Claims for relief of the Class; and (d) as there is no existing conflict between the Class representatives and the other members of the Class, and as both the representatives and their counsel are willing and able to prosecute this action vigorously, the Class representatives would fairly and adequately protect the interests of the Class. (*See* Certification Order at ¶ E, §§ 3–9.)

## C. Background of the Texas Action

In late 1994, two lawsuits were filed by individual plaintiffs in the 127th District Court of Harris County, Texas, on behalf of a putative class of investors who had purchased units in 23 "Geodyne" oil and gas limited partnerships marketed by Paine-Webber between March, 1987 and June, 1991.[7] They were consolidated by Judge Sharolyn Wood of the Texas District Court on April 26, 1995, under the caption *Neidich. et al. v. Geodyne Resources. Inc., et al.*, No. 94–052860 (Harris County, Texas), and an Executive Committee of plaintiffs' counsel was appointed. (*See* Affidavit of Karen Morris in Support of the Proposed Settlement ("Morris Aff.") at ¶¶ 2–3.)

In May of 1995, the plaintiffs in those actions filed a Consolidated and Amended Petition ("Texas Petition") in the Texas Court against PaineWebber and other defendants, asserting claims under state law arising from the marketing and sale of the Geodyne Units. The Consolidated Petition charges Defendants with substantially the same course of conduct set forth in the Federal Consolidated Complaint, and alleges, among other claims, that PaineWebber deliberately misled investors by concealing the speculative nature of the Geodyne Units and by misrepresenting the safety and likely benefits of those investments. It is further alleged that PaineWebber knew that their projections for the Geodyne Units were not attainable and that those partnerships were not appropriate for investors seeking to preserve capital. The Petition seeks redress under Texas law for fraud, breach of fiduciary duty and negligent misrepresentation. (*See* Settlement Notice at ¶ 5.)

The following month, the Consolidated Petition was certified by Judge Wood as a class action pursuant to Rule 42(b)(4) of the Texas Rules of Civil Procedure. The Class in the Texas Action consists of all persons or entities who purchased Geodyne Units from or through PaineWebber.[8] (*See* Notice of Pendency of Class Actions ("Notice of Pendency") at ¶ 7.)

## D. Pretrial Coordination of the Federal and Texas Actions

In late May and early June of 1995, Judge Haight and Judge Wood issued orders which coordinated the Federal and Texas Actions in the Federal Court for pretrial purposes, in accordance with the stipulation of the Parties. Pursuant to those Stipulations and Orders, the Texas Class agreed to be bound by the Federal Court's final determination of

---

6. Excluded from the Class are the following: officers and directors of PaineWebber, their families and heirs; those who acquired Partnership units from a source other than PaineWebber; those who have settled their Partnership claims against PaineWebber and have signed a release; and those who have resolved their Partnership claims against PaineWebber in a separate litigation or arbitration.

7. The Geodyne Units at issue in the Texas Action are the following: PaineWebber/Geodyne Energy Income Limited Partnerships II–A through II–H;

PaineWebber/Geodyne Energy Income Limited Partnerships III–A through III–G; and Paine-Webber/Geodyne Inst/Pension Energy Income P–1 through P–8 Limited Partnerships. Six additional Geodyne Partnerships (PaineWebber/Geodyne Energy Income Limited Partnerships I–A through I–F) are part of the Federal Action but are not included in the Texas Action.

8. Exclusions from the Texas Class are the same as for the Federal Class. *See supra* note 6.

legal and factual issues concerning the 23 Geodyne Units involved in both actions, and to coordinate with the Federal Class any pleadings or pretrial motion practice relating to Geodyne. The parties also agreed to coordinate investigation and discovery regarding the Geodyne Units. (*See* Case Management Order No. 3 at ¶¶ 1–10.)

On June 7, 1995, pursuant to the Orders of Class Certification, and in accordance with Fed R. Civ. P. 23(c)(2), a joint Notice of Pendency of the Class Action was mailed by the Notice Administrator, Rudolph, Palitz LLP. The Administrator mailed 218,398 copies of the Notice to individuals and companies whose names were provided by Paine-Webber, and also to nominees whose names the Administrator maintains on its own database.[9] (Chimicles Aff. at ¶ 23.) Recipients of the Notice included brokers and other record owners of Partnership interests, who were instructed to forward the Notice to beneficial owners, or to provide the names of such owners to Class Counsel. (*See* Notice Of Pendency at ¶ 20.) Within 10 days of this mailing, a summary version of the Notice was also printed in the national editions of *The Wall Street Journal, The New York Times* and *USA Today.* Among other information, the Notice of Pendency summarized the claims asserted in the Complaint and the Texas Petition, defined the Federal and Texas Classes, identified the members of the Executive Committees, apprised Class Members of their right to opt out of the Class, and informed them that any such request must be postmarked or received by July 21, 1995. Subsequently, 5,458 timely requests for exclusion were received by the Notice Administrator. (Chimicles Aff. at ¶ 23.)[10]

### E. *Investigation. Discovery and Document Analysis*

Preliminary investigation and discovery was undertaken separately by lawyers in the Texas and Federal Actions prior to the certification and coordination of the two actions. (*See* Affidavit of Karen Morris in Support of Request for Attorneys' Fees ("Morris Fee Aff.") at ¶¶ 26; Chimicles Aff. at ¶ 25.) Thereafter, discovery was coordinated in accordance with Case Management Order No. 3, and PaineWebber produced, on a rolling basis, more than 200 boxes of documents to Class Counsel during the summer of 1995. (Chimicles Aff. at ¶ 25.) Additionally; Class Counsel subpoenaed documents from third parties, including former PaineWebber employees, general partners such as Geodyne, Pegasus and Samson Oil, and certain appraisal and accounting firms. In response to these subpoenas, Counsel obtained eight compact disks of information—each representing approximately 10 boxes of documents. By the early fall of 1995, Class Counsel was in possession of the equivalent of approximately 300 boxes of documents produced by PaineWebber and third parties or obtained from public sources, including prospectuses, marketing materials, quarterly and annual reports, correspondence and memoranda, due diligence materials, broker training materials, reserve reports, and financial records. (*Id.* at ¶¶ 25, 29.)

In addition, Class Counsel conducted interviews with hundreds of Class Members and former PaineWebber brokers regarding the sales tactics used by PaineWebber in its marketing of the Partnerships and the information provided to customers regarding the subsequent performance of those investments. Class Members were also requested to provide Counsel with copies of the written sales materials they had been given by PaineWebber in connection with their purchases of Partnership units. (Chimicles Aff. at ¶ 26.) Between October 1995 and January 1996, pursuant to a deposition protocol nego-

---

9. The number of mailed copies exceeds the number of potential Class Members because investors with multiple accounts received multiple notices. The number of potential class members has been estimated by Class Counsel to be approximately 150,000. (*See* Class Mem. at 2, 29.)

10. Since the expiration of the exclusion deadline, this Court has received a number of motions by Class Members seeking to opt out late. These have been decided on an individual basis pursuant to the legal standard of "excusable neglect." In addition, duplicative proceedings commenced by Class Members in other jurisdictions have been enjoined by Order of this Court or by stipulation of the Parties. (*See* Opinion and Order dated June 28, 1996; Stipulation and Order dated December 11, 1996.)

tiated by the Parties, Class Counsel deposed approximately 30 individuals, including: PaineWebber personnel responsible for the creation and sale of the Partnerships and for due diligence and compliance with state and federal regulations; officers of selected PaineWebber subsidiaries and affiliates; and current and former PaineWebber brokers. (*Id.*) Class Counsel also deposed third parties, including officers and managers of the Pegasus Partnerships, and, in coordination with Texas Counsel, individuals involved in the sale and operations of the Geodyne Partnerships. Certain of the deponents located beyond the subpoena jurisdiction of this Court were deposed on videotape in order to preserve their testimony for trial. (*Id.*; Morris Fee Aff. at ¶ 37.)

The documents obtained by Class Counsel through the discovery process and from public sources were coded in a master database for review and analysis. (Chimicles Aff. at ¶¶ 30–32.) Meanwhile, the 70 Partnerships were subdivided and classified by industry— i.e., real estate, Geodyne, Pegasus, and research & development—and each class was assigned to an attorney working group under the aegis of a member of the Executive Committee. Finally, individual firms, drawn from among plaintiffs' counsel in the original lawsuits, were assigned to review discovery materials with respect to specific Partnerships. (Chimicles Aff. at ¶ 28.) The review and analysis of Geodyne-related documents was coordinated with Counsel in the Texas Action, which had already performed work with respect to those Partnerships. The Executive Committee, in its role as supervisor of the process, prepared analysis guidelines for the working groups, circulated memoranda and status reports, and organized meetings to facilitate the sharing of information. (*Id.*)

Beginning in June of 1995 and running through September of 1996, Class Counsel retained the services of industry and financial experts to provide assistance in analyzing the merits of the various claims and in calculating residual values for each of the 70 Partnerships. The foundation of these analyses was the "initial financial condition summary" prepared in December of 1994 by Kathleen Balon, a financial expert retained by Class Counsel. (*See* Affidavit of Kathleen Balon ("Balon Aff.") at ¶¶ 42–46.) The following experts were engaged: James Vodola of PASCORP (valuation of Real Estate Partnerships and REITs, and Remaining Value Guarantees); Gustavson Associates (valuation of Geodyne Partnerships); Professor William Jordan (assistance with Pegasus and Geodyne, and partnership structure in general); David Treitel of Simat, Helliesen & Eichner, Inc. (valuation of Pegasus Partnerships); Michael Dowd of Equity Research Collaborative and Mark Roth of Korpacz & Associates, Inc. (statistical data affecting the Real Estate Partnerships); and Candace Preston of Princeton Venture Research (valuation of certain Partnerships and of the proposed Additional Benefits). (See Balon Aff. at ¶ 38; Balon Deposition Tr. at 13, 61; Chimicles Aff. at ¶ 33.) [11]

Under Balon's supervision, these individuals analyzed the performance histories, current assets, and financial conditions of each Partnership, including cost structures, debt burdens, likely liquidation periods, and potentials for future income generation. They also reviewed particular industry and market risks for the purpose of discounting future cash flows. (Balon Aff. at ¶¶ 17–18, 39.) [12] Specifically, with regard to the 28 real estate Partnerships, they analyzed individual property financial statements, cash flow projections and, where appropriate, joint venture agreements, for approximately 180 properties. For each of the 29 Geodyne Partnerships, they reviewed up to four years of reserve data, comprising information relating

**11.** In addition, Counsel for the Texas Class retained the following experts with respect to the Geodyne Partnerships: Frank Webster (valuations); Huddleston & Co. (reserve analysis); Corporate Capital Consultants, Inc. (analysis of prospectuses); Hugh Lamle (valuation and consulting); Eisner & Co. (forensic accounting analysis); and Ten Eyck Associates, Inc. (forensic accounting, analysis of public filings regarding Partnership performance).

**12.** Balon also prepared alternative scenario valuations using such factors as third-party appraisals, general partner repurchase offers, and secondary market activity and pricing. (*Id.* at ¶¶ 32–33.)

to three reserve categories as well as operating costs. For the two Pegasus Partnerships, they analyzed the 17 aircraft leases in place, including expected revenue from each lease, the credit quality of the lessees, and the estimated residual market value of each aircraft. With regard to the R & D Partnerships, they evaluated individual royalty contracts and projected revenue. (*Id.* at ¶ 24.) For the remaining Partnerships, including the Fiduciary Capital and Preferred Yield Partnerships, a less extensive analysis was prepared due to lack of available information. (*Id.* at ¶ 25.) On the basis of these studies, Balon and the experts assigned fair market values to the assets and operations remaining in each of the 70 Partnerships, as discounted to January 1, 1996. These residual values would be crucial to Class Counsel's calculation of the "Recognized Losses" suffered by the Class, which calculations would, in turn, provide the touchstone for the negotiation of the Settlement, the Plan of Allocation, and certain Additional Benefits. (*See id.* at ¶¶ 18–19.)

## F. Settlement Negotiations

On July 27, 1995, PaineWebber announced that it would take a $200 million charge against earnings to cover potential liabilities arising from its marketing and sale of the Partnerships. Such liabilities included any judgments, settlements, fees and costs incurred in connection with the Federal and Texas Actions, opt outs from those actions, other individual or mass litigations and arbitrations, and an ongoing SEC investigation.[13] (Chimicles Aff. at ¶ 100.) PaineWebber also announced that it had entered into settlement negotiations with the SEC. (*Id.*) Several weeks later, PaineWebber made a prelimi-

nary settlement offer to Class Counsel; the offer allegedly represented "a small fraction of the ultimate Settlement," and was rejected. (*Id.*) Settlement negotiations between the Parties began in earnest in October, 1995, after the conclusion of the bulk of discovery. (*Id.* at ¶ 37.) In connection with those negotiations, Class Counsel established a Settlement Committee, and also convened a "Sounding Board" from among the named plaintiffs to assist in evaluating settlement proposals and to bring specific investor concerns to the attention of the Settlement Committee.[14] (*Id.* at ¶ 42.)

### (1) Loss Calculations and Negotiation of the Settlement Fund

Underlying the negotiations between the Parties was Class Counsel's calculation of the losses suffered by investors in each of the Partnerships. Based on the data analyses performed by the various attorney working groups and experts, and in consideration of the risks that would be involved in establishing damages at trial, Class Counsel decided to proceed, for settlement purposes, on a theory of "Recognized Loss." Accordingly, investor losses in each Partnership Unit were deemed to equal the Unit's purchase price, minus all cash distributions received through December 31, 1995, minus the residual value, if any, of the Partnership Unit as of January 1, 1996. (Chimicles Aff. at ¶ 90.) Other legal theories, such as lost investment opportunity, were not included in the evaluation, and no interest component was applied.[15] Distributions were assumed to encompass both income and return on capital; tax benefits, with one exception, were not considered.[16] Finally, with respect to residual values, the asset valuations performed for each

---

**13.** *See infra* Section G.

**14.** The Sounding Board, created in September 1995, represented diverse geographical areas and Partnership interests. Its members included investors in R & D Partners I–III, Equity Partners II, Qualified Plan Property Fund III, Geodyne Institutional/Pension Energy Income Partners P–5, and Pegasus Aircraft Partnership II. (Chimicles Aff. at 42.)

**15.** Class Counsel's expert has estimated that a standard interest component would probably double the amount of damages, and that a loss

theory aimed at compensating Class Members for the promised return on the Partnerships would probably result in damages of over one billion dollars. (*See* Balon Aff. at ¶ 34.) Such an amount was deemed by Class Counsel to be "unmanageably large" in light of the funds available for settlement. (Class Mem. at 41 n. 19.)

**16.** Tax benefits were counted as distributions only for the CMJ Properties Partnership, which was structured specifically as a tax shelter and produced no other benefits. (*See* Class Mem. at 60.)

Partnership by Balon with the assistance of the retained experts, as described above, were adopted by Class Counsel. (Balon Aff. at ¶ 32.) [17]

.The total capital investment by Class Members in the Partnerships, as adjusted for opt outs and independently settled claims, was determined to be approximately $2.3 billion, of which $1.2 billion (53%) was invested in the Real Estate Partnerships and REITs, $444 million (19%) was invested in the Geodyne oil and gas partnerships, $176 million (8%) was invested in the Pegasus aircraft leasing Partnerships, and $458 million (20%) was invested in partnerships operating in other industries, including research and development, equipment leasing, mezzanine capital, futures trading and media debt. (Class Mem. at 9–10.) Total distributions from the 70 Partnerships through December 31, 1995 were approximately $1.46 billion, with distributions exceeding the amount of investment in 14 cases. (*Id.* at 10.) For the remaining Partnerships, the amount of capital at risk (including capital lost through liquidated Partnerships) was determined to be $913 million, and the residual value of these investments as of January 1, 1996 was deemed to be $589 million. (Chimicles Aff. at ¶ 38.) Based on these figures, Class Counsel estimated that the total Recognized Loss suffered by the Class as of January 1, 1996, again as adjusted for opt outs and other settlements, was approximately $410 million. (Balon Aff. at ¶ 36.) Of this amount, $285.4 million was lost in the Real Estate Partnerships, $115.2 million in Geodyne, $8.99 million in Pegasus, and $530,000 in other Partnerships. (Morris Aff. at ¶ 7 & n. 3.) [18]

The Parties engaged in arm's length negotiations during the late fall of 1995. During the negotiations, there was substantial disagreement over Class Counsel's calculation of the residual values, particularly with regard to the projected earning capacity of the Partnerships. (Chimicles Aff. at ¶ 38.) On December 12, 1995, the Parties entered into an initial Memorandum of Understanding ("MOU"). An amended MOU, together with a Stipulation and Order Approving Appointment of Escrow Agents and Establishing an Account with the Court, was filed with, and signed by, this Court approximately one month later, on January 18, 1996. (Chimicles Aff. at ¶ 48.) The MOU provided for the immediate payment by PaineWebber of $125 million into a cash Settlement Fund for the benefit of the Class, and for the prompt negotiation of Additional Benefits having a further value to the Class of at least $75 million. Pursuant to the MOU and Order, PaineWebber deposited $125 million into an interest-bearing escrow account with the Court Registry Investment System that same day, January 18, 1996. (Chimicles Aff. at ¶ 48.)

### (2) *Negotiation of the Additional Benefits*

Following the execution of the MOU, and in accordance with its terms, the Parties proceeded with the negotiation of the Additional Benefits, attempting to confer at least $75 million in economic value on the Class, without any immediate outlay of cash by PaineWebber, at the same time as tailoring the Benefits where possible to the particular needs of investors in the different Partnerships.

At issue in the negotiation was the creation of specific guarantees to protect those Class Members who—because cash flow projections for their investments are determined to be high—might be saddled with artificially low levels of Recognized Loss as of January 1, 1996. Such guarantees would shift a por-

---

17. These values would continue to be refined in early 1996 for the purpose of negotiating the Additional Benefits and the Plan of Allocation. In general, the expert valuations approximated the findings of PaineWebber's own third-party appraisers, with the exception of the Geodyne Partnerships, whose residual values came out lower than secondary market prices. (Balon Aff. at ¶ 35.)

18. Until all claims are filed, these estimates remain subject to several variables, including the demographics of investors who purchased units in the secondary market or sold units prior to January 1, 1996, or who have opted out of the Class or settled their claims independently. (Balon Aff. at ¶ 37.) Specific distribution and residual value figures for each Partnership appear in the Data Appendix to the Settlement Agreement.

tion of the risk of future performance from the investor to PaineWebber, and negotiations therefore included an assessment of the amount of risk PaineWebber was willing to assume in each Partnership. In those Partnerships where PaineWebber continued to control the operations, it was willing to assume more risk; conversely, in those Partnerships where it no longer had control or economic interest, such as Geodyne, it was unwilling to provide a "Par" or "Remaining Value" guarantee. (Chimicles Aff. at ¶ 73.)

On July 11, 1996, the Parties concluded the Settlement Agreement, which incorporated Additional Benefits—Par Guarantees, the Remaining Value Guarantee, the Geodyne Guarantee, waived and assigned fees, and other benefits—worth at least $75 million. The Settlement also includes an Additional Benefits Protocol which outlines procedures for any valuations that may be required, as well as for the selection of mutually acceptable appraisers and advisors.[19]

### (3) Development of the Plan of Allocation

Also during the first six months of 1996, Class Counsel established an Allocation Committee to develop a fair method of distributing Settlement proceeds among Class Members. Within this Committee, separate advocacy teams were created to represent the claims of investors in the four major Partnership groups—Real Estate, Geodyne, Pegasus, and R & D. These advocacy teams were composed of the same law firms and industry experts that had been responsible for each Partnership group during the discovery phase of the litigation. The purpose of the Allocation Committee's structure was to encourage an independent evaluation of each group's claims, and to promote, through an internal adversarial process, an objective

comparison of the relative rights of all Class Members. In early 1996, each advocacy team, in conjunction with its assigned expert or experts, reviewed the merits of its constituent investors' claims. In addition, Class Counsel prepared assessments of the impact of various statutes of limitation on all claims. (Chimicles Aff. at ¶ 61.) All the teams met together to assess relative strengths and weaknesses and the opinions of the investor Sounding Board were solicited. (Class Plaintiffs' Supplemental Memorandum in Further Support of Approval ("Class Supp. Mem.") at 18 n. 18.)

The Allocation Committee ultimately determined that while some distinctions existed between the claims asserted by different Class Members, all claims demonstrated substantial merit.[20] Similarly, the Committee found that no reasonable basis existed to treat the Partnerships differently on the basis of possible statute of limitations defenses, at least with regard to RICO liability, where the most substantial such defenses had been raised. (Chimicles Aff. at ¶ 66.) Consequently, the Committee concluded that any differences that might exist among the strengths or weaknesses of particular claims were not sufficient, given the determined basic ability of all plaintiffs to establish liability, to justify "weighting" the distribution of Settlement proceeds in favor of certain Class Members over others. (Class Mem. at 51; Class Supp. Mem. at 14; Chimicles Aff. at ¶ 89.)

It was decided instead that the primary purpose of allocation should be to return to all investors the greatest possible percentage of their invested capital, and that the Plan should therefore be based simply on an investor's pro rata share of Recognized Loss,

**19.** For a summary of the terms of the Additional Benefits, see *infra* Section H.

**20.** For example, the advocacy team responsible for the Real Estate Partnerships concluded that PaineWebber had committed marketing abuses constituting fraud and breach of fiduciary duty, had engaged in questionable financing techniques, had failed to disclose the full extent of fees and commissions, and had stockpiled property purchases indiscriminately. The Geodyne Team, led by Texas Counsel, found, *inter alia*, that PaineWebber had defrauded investors, par-

ticularly with regard to the safety and likely profitability of the Geodyne Partnerships. Similarly, the Pegasus team concluded that a fraud had been committed on Pegasus investors with regard to the safety and income potential of the aircraft leases (including the likely resale value of the leased aircraft), and that in particular Paine-Webber had failed to disclose that a nearly identical aircraft leasing plan was rejected by Shearson–Hutton in 1988. (*See* Chimicles Aff. at ¶¶ 61–65.)

without regard to the relative merits of his or her particular claim. (Class Mem. at 50.) This uniform allocation theory, in conjunction with the specific tailoring provided by the Additional Benefits, was deemed by the Committee to be the fairest overall method of apportioning the Settlement proceeds. (*See* Class Supp. Mem. at 12.)[21]

### G. *The SEC Investigation*

During the pendency of the Federal and Texas Actions, PaineWebber was also the subject of an investigation by the Securities and Exchange Commission ("SEC") regarding the marketing and sale of certain Partnerships. The existence and purpose of the SEC investigation were disclosed in an article published in the *Wall Street Journal* on November 22, 1994, just prior to the filing of the first lawsuits in the Federal Action. (Complaint at ¶¶ 14, 24.) A second article, published on February 7, 1995, revealed that PaineWebber and the SEC were involved in negotiations to settle the Commission's claims. (*Id.* at ¶¶ 15, 25.) As noted earlier, PaineWebber announced on July 27, 1995 that it would take a $200 million charge to cover the "costs of resolving the limited partnership issues," and that it expected to conclude settlement talks with the SEC within 90 days.[22]

On January 17, 1996, the Commission issued a highly critical Order Instituting Public Administrative Proceedings, Making Findings, Imposing Remedial Sanctions, and Issuing Cease and Desist Order ("SEC Order"), to which PaineWebber consented without admitting or denying its findings. The Order was filed in this Court on the following day, contemporaneously with the MOU in the Federal and Texas Actions.[23] The SEC Order sets forth extensive findings of violations by PaineWebber of the federal securities laws, and addresses many of the same claims and facts at issue in the Complaint and in the Texas Petition.[24] Pursuant to its agreement with the SEC, PaineWebber agreed to pay a total of $292.5 million for the benefit of aggrieved Partnership investors, including $120 million to settle individual suits and arbitrations, and $40 million for a special claims fund ("SEC Fund") to be allocated among eligible claimants.[25] In addition, the Order required PaineWebber to pay a civil penalty of $5 million, to waive or assign all fees generated from the Partnerships, and to implement certain oversight and management policies. (Class Mem. at 8.) Finally, the Order gave PaineWebber credit for the $125 million it had paid into the Settlement Fund pursuant to the MOU in the Federal and Texas Actions; however, in a "flipback" clause, the Order also specifically provided that the Settlement of these actions must be judicially approved by a specific date—unless that date were extended by this Court—or the $125 million would then be distributed among claimants to the SEC fund.

### H. *The Terms of the Proposed Settlement*

The terms of the proposed Settlement are set forth in detail in the Settlement Agreement. In essence, it seeks to compensate

---

21. For a summary of the terms of the Plan of Allocation, *see infra,* Section I.

22. The impact of the SEC investigation on these actions is primarily relevant to Class Counsel's request for attorneys' fees, and will be examined more fully in a separate Order addressing that request.

23. The Order was filed in an action entitled *SEC v. PaineWebber Inc.,* 96 Civ 0331(SHS), commenced—and simultaneously resolved—in this Court as a related case to the Consolidated Complaint.

24. In several respects, however, the findings in the SEC Order are narrower than the claims in these actions. Most notably, while the SEC Order focuses on PaineWebber's marketing of the Geodyne units, and also addresses Pegasus and four of the mortgage Partnerships, it does not make specific findings regarding the Real Estate and R & D Partnerships, which represent approximately 65% of the sales at issue in these actions. Nor does the Order address units purchased from 1980 through 1985. Finally, while the Order is primarily concerned with Paine-Webber's marketing and sale of "unsuitable" investments to individual customers, these actions additionally allege a company-wide pattern of sales fraud, including prospectus fraud. (*See* Morris Fee Aff. at ¶ 73.)

25. Qualified members of the Federal and Texas Classes may file claims in both settlements, but may not recover twice for the same alleged loss.

Class Members for as much of their initial investments as possible, either through distributions or through direct payments by PaineWebber. (Class Mem. at 48–50.) The Settlement has a total value of approximately $200 million and is composed of the following two parts: (1) the $125 million Settlement Fund, which has been deposited by Paine-Webber into an interest-bearing escrow account, and from which attorneys' fees and litigation expenses will be deducted; and (2) the Additional Benefits, discussed below, which the parties assert to be worth at least $75 million. The Additional Benefits are comprised of three specific performance guarantees—the Par Guarantees, the Remaining Value Guarantee and the Geodyne Guarantee—which collectively have been valued by the Parties at approximately $65 million, as well as a provision for the waiver or assignment of future fees and compensation worth at least $10 million. In addition, the Settlement provides certain groups of Class Members with various non-cash benefits, to which no specific value has been assigned.

Pursuant to the Par Guarantees, Paine-Webber promises that investors in the 13 Par Guarantee Partnerships [26] will, by December 31, 2000, have recouped at least the initial purchase price ("Par Value") of their investments. Thus, if on December 31, 2000, the sum of all cash distributions paid out over the life of a covered Partnership, plus the residual value of that Partnership, equal less than the Partnership's Par Value, Paine-Webber will pay the difference.[27] For the purposes of this guarantee, "distributions" include any cash payments received from the Settlement Fund or the SEC fund in connection with claims arising from the Partnership. The current economic value of this Guarantee to the Class has been calculated by plaintiff's expert to be at least $10.25 million. (Balon Aff. at ¶¶ 8–9.)

Pursuant to the Remaining Value Guarantee, PaineWebber promises that the aggregate amount recouped by investors in the 12 covered Partnerships [28] as of December 31, 2000, will be $257 million, i.e. approximately $92 million more than the aggregate value of those same Partnerships as of January 1, 1996. Thus, on December 31, 2000, if the sum of all cash distributions paid out by the covered Partnerships, plus the remaining values of those Partnerships, together equal less than $257 million, PaineWebber will pay the difference. Because these guarantees are considered in the aggregate, PaineWebber may use a better-than-projected performance by one Partnership to partially offset payments which would otherwise be due to a poor performer; however, the extent to which extraordinary profits may be used in this way to fulfill the overall guarantee obligation is limited. The current economic value of this guarantee to the Class has been calculated to be at least $42.7 million. (Balon Aff. at ¶¶ 8–9.)

Pursuant to the Geodyne Guarantee, PaineWebber promises to provide protection to investors in the 29 Geodyne Partnerships in the event that oil and/or gas prices fall below specified levels between January 1, 1997 and May 30, 2001. Specifically, if market prices should drop below $18.00 per barrel of oil and $1.80 per MCF of gas during the relevant period, PaineWebber will pay Geodyne investors the difference, in specified quantities, between the market price and the guarantee price. The current economic value of this guarantee to the Class has been

---

26. The Par Guarantee Partnerships are: Fiduciary Capital Partners, L.P.; Fiduciary Capital Pension Partners, L.P.; PaineWebber Independent Living Mtge. Fund, Ltd.; PaineWebber Independent Living Mtge, Inc. II; PaineWebber Insured Mortgage Partners IB, L.P.; Participating Income Properties III Limited Partnership; PaineWebber Preferred Yield Fund, L.P.; PW Preferred Yield II, L.P.; PaineWebber R & D Partners, L.P.; PaineWebber R & D Partners II, L.P. and III, L.P.; Pegasus Aircraft Partners, L.P.; and Pegasus Aircraft Partners II, L.P.

27. PaineWebber's obligation is capped with respect to two of the Par Guarantee Partnerships, PW Preferred Yield II, L.P. (maximum payment of $7 million) and Pegasus Aircraft Partners II, L.P. (maximum payment of $12 million).

28. The Remaining Value Guarantee Partnerships are: PaineWebber Equity Partners I through III Limited Partnerships; PaineWebber Growth Properties I through III, L.P.; PaineWebber Income Properties Four through Eight Limited Partnerships; and PaineWebber Mortgage Partners V, L.P.

calculated to be at least $12.5 million. (Balon Aff. at ¶¶ 8, 14.)

PaineWebber further agrees to assign or waive for the benefit of Class Members all fees or other compensation which it will earn from the Partnerships—including amounts which it might receive as general partner in any of the Partnerships—from January 16, 1996 through the termination of each Partnership. PaineWebber guarantees that the value to the Class of such waivers and assignments will be at least $10 million as of December 31, 2000. Of this amount, approximately $7.425 million will be in the form of cash from assigned fees and approximately $2.575 million will be in the form of waived fees, particularly loans and costs relating to the liquidation of the Retail Property Investors Partnership ("RPI"). (Balon Aff. at ¶¶ 4, 6.)

In addition to these cash benefits, the Settlement provides various other advantages for which no economic value has been assigned. These include an independent valuation opinion and tax effect assessment of the CMJ Properties Partnership, free facilitation of the liquidation of warrants distributed to Class Members from the R & D Partnerships, and advisory opinions regarding tender offers, roll-up proposals, or other proposals which may be considered by Class Members with regard to the Partnerships. (Balon Aff. at ¶ 4.)

## I. *The Terms of the Proposed Plan of Allocation*

The terms of the proposed Plan of Allocation are set out in detail in the Settlement Agreement. Basically, the proceeds of the Settlement are to be allocated pro rata among Class Members on the basis of Recognized Loss. The latter term is comprised of a Class Member's initial investment in a Partnership unit (i.e., the unit's purchase price), minus (a) all distributions paid out or payable on that unit, and (b) any value remaining in the unit as of a specified date. To participate in the Settlement, Class Members must

submit a proof of claim form setting forth, among other data, the date and quantity of their purchase and or sale of Partnership units. Upon receipt of all valid claim forms, the Claims Administrator will calculate the aggregate Recognized Loss suffered by all eligible claimants, and the Settlement proceeds will then be allocated to each claimant in the same proportion that his or her own loss bears to the loss of the Class as a whole. As previously noted, the formula for computing Recognized Loss for every Class Member is identical. The Plan of Allocation assumes a comparable potential of all Class Members to prevail on the merits, and accordingly it does not reflect any differences in relative strength that might exist among the claims of investors in different Partnerships.

### (1) *Allocation of the Net Cash Settlement Fund.*

The Net Cash Settlement Fund consists of the § 125 million in cash deposited by Paine-Webber on January 18, 1996, plus interest. less attorneys' fees and litigation expenses. For the purpose of allocating this fund, Recognized Loss per Partnership unit is determined as of January 1, 1996 in the manner described above. For Class Members who sold their units prior to January 1, 1996, distributions are calculated only through the date of sale, and the price at which the unit was sold is considered in place of the unit's residual value. For Partnerships which have been, or are deemed to be, "liquidated," Recognized Loss equals the purchase price of the Partnership, minus all cash distributions up to and including the final distribution following liquidation. Finally, for the Paine-Webber CMJ Properties Partnership only, tax benefits are deemed to count as cash distributions for the purpose of Recognized Loss.

Based on Class Counsel's valuations of the Partnerships as of January 1, 1996, it is likely that only 44 Partnerships will show Recognized Losses for the purpose of sharing in the Settlement Fund.[29] The specific

---

29. Those 44 Partnerships are the following: PaineWebber/Geodyne Energy Income Limited Partnerships I–A through I–C; Paine-Webber/Geodyne Energy Income Limited Part-

nerships II–A through II–H; PaineWebber/Geodyne Energy Income Limited Partnerships III–A through III–G; PaineWebber/Geodyne Inst/Pension Energy Income P–1 through P–8 Limited

amounts that will be paid out on these investments cannot be calculated prior to the submission of all claims and the determination of fees and litigation expenses. In the event that the aggregate Recognized Loss of the Class is less than the amount in the Net Cash Settlement Fund, the balance will be paid into a "Look–Back Fund," and redistributed on the basis of Recognized Loss as of December 31, 2000.[30]

### (2) Allocation of the Additional Benefits and Look–Back Fund

The Additional Benefits provide that cash payments may be made by PaineWebber to eligible Class Members pursuant to the Par Guarantees, the Remaining Value Guarantee, and the Geodyne Guarantee. Such payments will be made on a pro rata basis to those Class Members who are covered by each Guarantee, and will not exceed the amount of any Class Member's Recognized Loss as of the end of the year 2000. For the purpose of allocating these payments, Recognized Loss per Partnership unit is calculated as of December 31, 2000 in the manner described earlier. Cash distributions include any value already received in relation to the Partnership unit pursuant to any of the Guarantees, the Net Cash Settlement Fund or the SEC Fund.

The Additional Benefits also provide for the waiver or assignment of PaineWebber's fees and other compensation relating to the Partnerships. All waivers will benefit the Class Members who hold units in the particular Partnerships to which the waivers apply. All assignments, with limited exceptions,[31] will be paid directly into a "Look–Back Fund," together with any non-allocated funds owed by PaineWebber pursuant to the Guarantees and any amounts which may remain in the Net Cash Settlement Fund. The Look–Back Fund will in turn be allocated among the class as a whole, again on a pro rata basis, to compensate any Class Members who still have Recognized Losses remaining.[32]

### J. Objections to the Proposed Settlement and Plan of Allocation

As noted above, on July 17, 1996, this Court preliminarily approved the Settlement Agreement, and directed the Parties to provide notice to the Class. On August 5, 1996, almost 200,000 copies of the Settlement Notice were mailed to all identifiable class members, setting forth the material terms of the Settlement, including the Plan of Allocation and the proposed award of attorneys' fees.[33] Class members were also apprised of the deadline for filing any objections to the settlement, as well as the date, location and purpose of the fairness hearing. A summary version of the same notice was subsequently published in the national editions of *The Wall Street Journal, The New York Times* and *USA Today* on August 12 and 15, 1996. Three objections to the Settlement terms were received from Class Members in re-

---

Partnerships; PaineWebber Development Partners IV, Ltd.; PaineWebber Equity Partners I through III Limited Partnerships; PaineWebber Growth Properties I, L.P. and II, L.P.; Paine-Webber Growth Partners III, L.P.; PaineWebber Income Properties Four through Eight Limited Partnerships; PaineWebber Mortgage Partners V, L.P.; PW Preferred Yield II, L.P.; Pegasus Aircraft Partners II, L.P.; PaineWebber Development Partners IV, L.P. (liquidated); Realty Southwest Fund II, Ltd. and III, Ltd. (liquidated); and Retail Property Investors, Inc. (liquidated).

**30.** *See* discussion, *infra* Subsection 2.

**31.** Because the Par Guarantees for the Pegasus II and Preferred Yield II Partnerships are capped, assigned fees and compensation arising from those Partnerships will be held in separate

escrow accounts and applied specifically toward the recoupment of Par Value for those Partnerships' investors. Once those investors have recovered 100% of their Recognized Losses, any remaining balance of assigned fees and compensation will revert to the Look–Back Fund.

**32.** 12% of the Look–Back Fund (not to exceed $2.5 million) will be segregated in a special escrow account for the benefit of any Geodyne investors who have not recovered their initial investments.

**33.** *See* Affidavit of Rudolph, Palitz LLP in Connection with Notice by Mailing and Publication, dated October 8, 1996. As with the Notice of Pendency, the number of copies mailed exceeds the potential number of Class Members, in part because investors with multiple accounts received multiple notices.

sponse to these notices.[34] Two of the objections involved individual situations and have been addressed and resolved.[35]

The third objection to the proposed Settlement was lodged by Robert and Vera Jacobson of Chicago, Illinois, on behalf of all Class Members in the Pegasus I and Pegasus II Partnerships and needs to be considered in some depth. The filing of this objection was part of an extended effort on the part of the Jacobsons and their counsel to participate in the litigation and settlement of the Pegasus-related claims against PaineWebber.

On March 28, 1995, the Jacobsons filed a class action complaint against PaineWebber and other defendants in state court in Chicago, alleging fraud, breach of fiduciary duty and negligent misrepresentation. After the Jacobsons received the Notice of Pendency, they sought access to all discovery materials produced by PaineWebber to Class Counsel in this litigation, in order to assist them in deciding whether or not to opt out of the Class. This Court directed that they be provided with discovery materials relating to the Pegasus Partnerships. (*See* Transcript of Oral Argument, July 19, 1995, at 54–56.) After reviewing those documents, the Jacobsons moved: (a) to intervene in this action and to be appointed as representatives of a Pegasus subclass pursuant to Fed.R.Civ.P. 23(c)(4)(B); (b) to have their counsel appointed as lead counsel on behalf of that subclass; and (c) to have their counsel appointed to plaintiffs' Executive Committee. (*See* Sandier Aff. in Supp. of Motion to Intervene at ¶ 1.) The Jacobsons alleged that the Class as certified was overly broad and inherently conflicted, and that its representatives and counsel therefore could not fairly represent the interests of Pegasus investors, whose claims were stronger on the merits than those of most other Class Members. (*Id.* at ¶¶ 15–17; Transcript of Oral Argument, January 19, 1996, at 13–14.) That motion was subsequently denied. (See Order dated February 26, 1996.)

The Jacobsons later sought and received further discovery and an extension of their time to file an objection. (*See* Transcript of Oral Argument, September 30, 1996, at 25; Order dated August 16, 1996, at 2.) Their objection was filed on October 3, 1996, together with notice of their intention to appear at the fairness hearing, and a list of exhibits and intended witnesses. Subsequently, the Jacobsons deposed several of Class Counsel's experts, including Kathleen Balon and David Treitel, and Class Counsel deposed the Jacobsons' two proposed expert witnesses, Susan Koniak and Carmen Macca.

The fairness hearing was held before this Court on October 25 and November 8, 1996. Following the presentation of argument by counsel for the Parties and for the Jacobsons, Susan Koniak and Carmen Macca were called to the stand as expert witnesses. Koniak, a Professor of Law at Boston University, was presented as an expert in legal ethics and class actions, and stated that her most recent research and writing have focused specifically on "the ethics of class counsel and class action abuse." (Transcript of Fairness Hearing, November 8, 1996, at 13–15, 28–29.)[36] She did not claim to have particular expertise in securities law, nor did she profess to hold a view concerning the fairness and adequacy of the proposed Settle-

---

34. A small number of objections to the proposed award of attorneys' fees were also received and will be addressed in this Court's forthcoming Order regarding those fees.

35. One objection, by Richard G. Clemens, concerned an issue relevant only to the PaineWebber CMJ Properties Partnership, and was resolved with the issuance of a Supplemental Notice to all CMJ investors (see Order dated December 11, 1996). The second objection, by Jerome Petrisko, involved the effect of certain proposed Settlement language on a pending litigation he had brought in Pennsylvania; that objection was ultimately withdrawn. (*See* Transcript of Fairness Hearing, October 25, 1996, at 9–10.)

36. Class Counsel have challenged Koniak's qualifications as an expert in class actions, citing her admitted lack of such expertise in 1994 when she testified in another class action fairness hearing. Class Counsel also emphasize Koniak's failure to review many of the relevant documents in this case, including the affidavits of Class Counsel and experts. See Class Supp. Mem. at 24. It is unnecessary to reach a decision regarding Koniak's expert status, however, because her actual testimony was substantively indistinguishable from legal argument, and is considered as such by this Court.

ment; the proper method of allocating that Settlement; the merits and settlement value of the claims in this case; or the creation of subclasses. (*Id.* at 26–27, 34–35, 70–73.) Rather, as set forth more particularly below, Koniak testified that in her opinion Class Counsel rendered inadequate representation to the Class, and may have colluded with the Defendants to the detriment of the Class Members. (*Id.* at 30, 46–47.)

Carmen Macca, a Certified Public Accountant who has reviewed class action settlement notices for clients on "over fifty" occasions, (*Id.* at 100–101), testified that he had reviewed the Settlement Notice, the Settlement Agreement, the Data Appendix, and "various correspondence among the attorneys," and that in his opinion, an individual Class Member would not be able to determine from those documents how much money he or she would stand to receive in the proposed Settlement. (*Id.* at 103–105.) The latter point is conceded by Class Counsel. (*Id.* at 106.)

The heart of the Jacobsons' objection is the claim that the Pegasus investors' recovery under the Settlement is too small, both in terms of their potential damages at trial and in comparison with the recoveries of other Class Members. The objection raises at least six distinct issues. First, the Jacobsons allege that the Class—and the Pegasus investors in particular—have been deprived of the adequate representation of counsel that is mandated by Fed.R.Civ.P. 23(a). Specifically, they contend that the Parties stipulated to a hasty Class certification in order to advance their own interests at the expense of the plaintiffs, that the Court improperly approved that certification without undertaking an independent investigation, and that consequently the Class is too broad and is fraught with conflicts among members whose claims are of vastly differing strengths.[37] Although Class Counsel purports to represent the interests of all Class Members simultaneously and has opposed all efforts to create subclasses, the Jacobsons assert that Class Counsel is in fact inherently conflicted, and that its representation of the Class is there-

fore inadequate. (*See* Jacobsons' Objection to Proposed Settlement ("Obj.Mem.") at 23–24; Jacobsons' Supplemental Memorandum in Further Support of Objection ("Obj.Supp.Mem.") at 5, 38–40; Transcript of Fairness Hearing, October 25, 1996 Tr. 10/25/96 at 54–57.) Evidence of such inadequacy can be found, the Jacobsons contend, in the Settlement itself, which fails to take account of variances among the claims, yet at the same time obtains different results for different Class Members with no merit-based explanation. (Obj. Supp. Mem. at 40–44; Tr. 11/08/96 at 30–33.)

Second, the Jacobsons claim that the Settlement Notice is inadequate because it ignores differences between Class Members' claims, obfuscates complexities contained in the Settlement, and glosses over special exceptions that have been made for particular Partnerships. (Obj. Mem. at 15–18, 20; Obj. Supp. Mem. at 7; Tr. 10/25/96 at 52.) In addition, the Jacobsons emphasize that because of missing or incomplete information, it would be impossible for an individual Class Member to determine from the Notice and its supporting documents what he or she might expect to receive from the settlement. (Obj. Mem. at 3–4; Obj. Supp. Mem. at 8.) This lack of accurate information, they suggest, led to the low number of objections that have been received from other Class Members. (Tr. 10/25/96 at 47.)

Third, the Jacobsons charge that the Settlement provides an inadequate recovery—both for the Class as a whole and for Pegasus investors in particular—given the magnitude of the legal damages that have been claimed and the relatively low risk of prevailing at trial. The proposed Settlement, they contend, represents a small fraction of the total amount invested by Class Members in the Partnerships. (Obj. Mem. at 2, 4–5.) More importantly, however, they assert that Class Counsel has made no attempt to relate the Settlement to any reasonable range of amounts that the Class, if successful, would stand to recover at trial. (Tr. 10/25/96 at 43–44.) Instead, the amount of the Settlement is justified by Class Counsel in terms of

---

37. This is essentially the same argument that was made by the Jacobsons in their earlier motion to intervene and to create a subclass for Pegasus investors.

"Recognized Loss," a measure which, the Jacobsons contend, was invented for these proceedings, is arbitrary and unfair, and bears little or no resemblance to actual economic loss or legal damages. (Obj. Supp. Mem. at 28.) In particular, it is asserted that the Settlement ignores the time value of money, collapses the distinction between taxable income and return of capital, and relies on residual value calculations without regard to marketability discounts. (Obj. Mem. at 20; Obj. Supp. Mem. at 28–29.) With regard to the Pegasus Partnerships specifically, the Jacobsons contend that pursuant to the various theories of legal damages claimed in the Complaint, they would stand to recover between $0.52 and $2.15 per dollar invested if they were to prevail at trial. (Obj. Supp. Mem. at 22–30.) Accordingly, even assuming a discount to reflect the risks of litigation, the Jacobsons claim that their likely cash recovery under the Settlement—zero for Pegasus I, and between 3 and 8 cents on the dollar for Pegasus II—is an inadequate result. (Obj. Supp. Mem. at 30–37.)

Fourth, the Jacobsons claim that the Settlement is unfair because although it purports to treat all Class Members equally, in fact it provides better recoveries to some than to others, and it does so with no adequate explanation. Specifically. they contend that the various Additional Benefits guarantees, if they create any real economic value at all, do so selectively and without any relation to the merits of Class Members' claims. (Obj. Supp. Mem. at 40–44; Tr. 11/08/96 at 33.) They also contend that there is no reason for the Par Guarantee for Pegasus II and another Partnership to be capped, except as an accommodation to PaineWebber. (Obj. Supp. Mem. at 34–35, 42.) Finally, the Jacobsons assert that the Settlement unfairly and inexplicably favors certain Partnerships with special rules and exceptions relating to the calculation of Recognized Loss. (Obj. Mem. at 15–19.)

The fifth, and most important, claim made by the Jacobsons is that the Plan of Allocation, while ostensibly uniform in its application, is unfair in its effect, because it fails to take account of differences that exist among the claims in this case, both in terms of substantive merit and in terms of vulnerability to statute of limitations defenses. (See Obj. Supp. Mem. at 15–21 & App. A.) The Jacobsons further note that when this issue was raised in connection with their earlier motion to create a subclass, Class Counsel assured the Court that any conflicts between the merits of different claims would be resolved in the Plan of Allocation. (Obj. Supp. Mem. at 5; Tr. 1/19/96 at 25–26.) Instead, the Jacobsons contend, the proposed loss-based (rather than merits-based) Plan of Allocation will divert the bulk of Settlement proceeds to Class Members whose claims are weak on the merits and most vulnerable to limitations defenses, while the Pegasus investors, whose claims are ostensibly among the strongest in the Class,[38] will emerge with little or no cash recovery. (Obj. Mem. at 5–7, 20–21.)

Finally, the Jacobsons claim—largely through Prof. Koniak—that the terms of the Settlement and the circumstances of its negotiation raise the possibility of collusion between the Parties, and undermine the fundamental requirement of arm's length negotiation. In support of this allegation, the Jacobsons point to the Parties' common interest in settling as many claims as possible in the wake of the liability exposure created by the SEC investigation. (Tr. 10/25/96 at 53.) In particular, they contend that the filing of the $125 million settlement on January 18, 1996, one day after the issuance of an SEC Order which included a $125 million "flipback" provision, indicates that the size of the settlement was driven by PaineWebber's interest and was not the product of arm's length negotiation. (Obj. Supp. Mem. at 18; Tr. 1 1/08/96 at 48–49.) The Jacobsons offer the following alleged

[38]. The Jacobsons assert that the Pegasus claims are stronger than those of other investors because, among other grounds, (1) they are the subject of specific findings in the SEC report; (2) there is evidence that the Pegasus Uniform Sales Materials were orchestrated by the Direct Investment Department ("DID") at PaineWebber headquarters; and (3) Pegasus units were purchased later than most other Partnerships and so are subject to fewer limitations defenses. (Obj. Mem. at 7–13; Obj. Supp. Mem. at 21–22.)

indicia of collusion: (a) the certification of the Class by stipulation of the Parties and on a conditional basis, and PaineWebber's subsequent announcement of a charge to earnings to cover all liabilities, which together suggest that the Class is akin to a "settlement class"; (b) the failure of the Parties to provide Class Members with a second opportunity to opt out following the Settlement, and the cooperation of the Parties in resisting the creation of subclasses; (c) the terms of the Settlement and Plan of Allocation, which "roll up" many dissimilar claims and in some instances benefit Paine-Webber at the expense of Class Members; and (d) the Parties' alleged concealment of relevant documents and overall lack of candor regarding the settlement process and the substance of the recovery, particularly with regard to the comparative merits of the various claims. (Obj. Mem. at 23–25; Obj. Supp. Mem. 18–19; Tr. 10/25/96 at 53, 67–74; Tr. 11/08/96 at 43–49.) The effect of these indicia, the Jacobsons claim, is to raise the level of scrutiny the Court should utilize in evaluating the Settlement's fairness, and to defeat the traditional presumption of deference to the recommendations of Counsel. (Obj. Mem. at 2; Obj. Supp. Mem. at 20.)

On the basis of these allegations, the Jacobsons have requested that this Court refuse to approve the Settlement in its entirety, or, in the alternative, refuse to approve the Settlement insofar as it relates to Pegasus I and II investors. (Obj. Supp. Mem. at 44.) Those issues are addressed below.

## II.

### DISCUSSION

A. *The Federal Class Certification is Fair*

■ The certification of the Federal Class was so ordered by Judge Haight on May 30, 1995, in accordance with the stipulation of the Parties. That stipulation addressed the elements of Rules 23(a) and 23(b)(3) and provided that "the requirements for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure are satisfied." (*See* Certification Order at ¶ E, §§ 3–9.)

The fairness of the certification, particularly with regard to adequacy of representation, was subsequently challenged by the Jacobsons in their motion to intervene and create a subclass, which was denied. (*See* Order dated February 26, 1996 at 7.) *See also In re PaineWebber Inc. Ltd. Partnerships Litig.,* 94 F.3d 49, 51–52 (2d Cir.1996). Although the present objection by the Jacobsons is largely duplicative of that earlier motion, the fairness of the Class certification will be revisited briefly here in light of this Court's affirmative obligation to insure that all class members have been adequately represented. *See Malchman v. Davis,* 706 F.2d 426, 432–33 (2d Cir.1983); *Plummer v. Chemical Bank,* 668 F.2d 654, 659 & n. 4 (2d Cir.1982).

As a starting point, it is worth noting that although the Class was certified without the benefit of an adversarial hearing, it is not a "settlement class" as that term is properly defined. A settlement class "is a device whereby the court postpones the formal certification procedure until the parties have successfully negotiated a settlement ... Because the court indulges the assumption of the class's existence only until a settlement is reached or the parties abandon the negotiations, settlement classes are also sometimes referred to as temporary or provisional classes." *In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 786 (3d Cir.1995) (*"GM Trucks "*). *See Weinberger v. Kendrick,* 698 F.2d 61, 72 (2d Cir.1982); *Malchman,* 706 F.2d at 433–34 (2d Cir.1983); *Manual for Complex Litigation* § 30.45 (3d ed.1995). In this action, class certification took place long before any settlement was reached or negotiated, and it is undisputed that extensive discovery and litigation efforts were undertaken by the Parties in the interim. Accordingly, the "higher" or "closer" level of scrutiny that applies to the judicial review of settlements involving settlement classes [39] is not required here.

In determining whether a federal class should be certified, the Court must consider the four factors set forth in Rule 23(a)—i.e., numerosity, commonality, typicality and rep-

---

**39.** *See Manual for Complex Litigation* § 30.44 (3d ed.1995); *Weinberger,* 698 F.2d at 73.

resentativeness—and must also determine, pursuant to Rule 23(b), whether a class action is the appropriate avenue of recovery. *See* Fed R. Civ. P. 23; *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 290 (2d Cir.1992); *In re Prudential Sec. Inc. Ltd Partnerships Litig.,* MDL No. 1005, M–21–67 (MP), 1995 WL 798907 at *12 (S.D.N.Y. Nov. 20, 1995).

■ Rule 23(a)(1), which requires that "the class [be] so numerous that joinder of all members is impracticable," is clearly satisfied here. Tens of thousands of investors purchased Partnership shares from or through PaineWebber between 1980 and 1992; joinder of all such plaintiffs individually would obviously be unmanageable. Similarly, Rule 23(b)(3), which requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy" is also satisfied here. Given the difficulty and expense involved in the prosecution of the claims in this case, the interests of justice and judicial efficiency underscore the superiority of the class action device.

■ Rule 23(a)(2), which requires the existence of "questions of law or fact common to the class," and Rule 23(b)(3), which requires that such questions "predominate over any questions affecting only individual members," are both satisfied here. The Complaint asserts essentially the same claims on behalf of all Class Members, and "alleges, in numerous places, that PaineWebber defrauded investors in *all* the applicable entities pursuant to a uniform pattern of conduct." (emphasis in original) (Order dated Feb. 26, 1996 at 4.) Common questions of law and fact include: whether PaineWebber's sales materials were false or misleading; whether PaineWebber engaged in a "common course of conduct" with respect to the statements made and the sales materials used; whether PaineWebber misrepresented the suitability of investments for individual clients or failed to take sufficient steps to insure such suitability; whether a conspiracy existed among two or more Defendants; whether a RICO "pattern" existed; whether Defendants' actions constituted fraud, negligence, breach of fiduciary duty or violation of the federal securities laws;

and whether the Class Members were injured by Defendants' actions. (*See* Certification Order at ¶ E, § 5.) These questions of law and fact overwhelmingly predominate over any issues that might affect individual Class Members only.

Rule 23(a)(3), which requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class," is also satisfied here. The named class representatives are investors in 20 of the 70 Partnerships, including Pegasus II. (*See* Order dated Feb. 26, 1996 at 1–2; Complaint at ¶¶ 27–45.) Their claims are materially indistinguishable from those of other Class Members.

■ Finally, Rule 23(a)(4), which requires that "the representative parties will fairly and adequately protect the interests of the class," is satisfied here as well. The standard for adequate representation has two parts: first, "class counsel must be 'qualified, experienced and generally able' to conduct the litigation"; and second, "the class members must not have interests that are 'antagonistic' to one another." *Drexel,* 960 F.2d at 291 (citing *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968)). The Jacobsons focus their attack on the second prong of this test, contending, just as they did in their prior motion, that inherent conflicts among investors in the different entities prevent the current named plaintiffs and their attorneys from adequately representing Pegasus I and II investors. In support of this objection, they assert primarily that the Pegasus plaintiffs' recovery under the Settlement does not adequately reflect the strength of their claims on the merits.

This position is no more persuasive now than it was one year ago. Potential conflict between class members is often a danger in large class actions, but those conflicts are best resolved through "the normal pull and tug" of factions within the class itself. (Tr. 1/19/96 at 29.) The Court's role in this process is not to substitute its own judgment for that of Class Counsel, but rather to insure that the interests of all class members are fairly and impartially represented throughout the negotiation of the settlement and alloca-

tion plan. In this action, the assignment of separate law firms and independent experts to represent each Partnership group was a reasonable and adequate means of protecting the interests of all Class Members; the Jacobsons' contention that their recovery should be greater is an insufficient basis on which to conclude that those safeguards failed or were corrupted in any way. Accordingly, the Rule 23(a)(4) requirement of adequate representation is satisfied.

Because the record establishes that all necessary elements of Rule 23 have been met, the fairness of the class certification is reaffirmed and the Jacobsons' renewed request for decertification of the class or the creation of a subclass is denied.

### B. *The Notice of Settlement is Adequate*

Fed.R.Civ.P. 23(e) provides that "notice of [a] proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." On July 17, 1996, this Court held that the Settlement Notice in this case "meet[s] the requirements of F[ed]. R. Civ. P. 23 and due process, constitute[s] the best notice practicable under the circumstances, and shall constitute due and sufficient notice to all persons and entities entitled thereto." (Preliminary Order dated July 11, 1996 at ¶¶ 5–6.) The Jacobsons now challenge the adequacy of the Settlement Notice on the grounds that it is misleading and incomplete, and does not provide sufficient information to allow a Class Member to calculate his or her actual recovery under the settlement.

Notice of settlement in a class action "must 'fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings.' " *Weinberger*, 698 F.2d at 70 (citing *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir.1975)). The notice need not be highly specific, and indeed "[n]umerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved 'very general description[s] of the proposed settlement.' " *Id.; see also In re Michael Milken & Assoc. Sec. Litig.*, 150 F.R.D. 57,

60 (S.D.N.Y.1993) (relying on *Handschu v. Special Servs. Div.*, 787 F.2d 828, 833 (2d Cir.1986)). Nor does the adequacy of notice turn on the ability of an individual Class Member to calculate the amount of his or her actual recovery under the settlement. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir.1993); *In re Catfish Antitrust Litig.*, 939 F.Supp. 493, 499 (N.D.Miss. 1996); *Cannon v. Texas Gulf Sulphur Co.*, 55 F.R.D. 308, 313 n. 2 (S.D.N.Y.1972).

The Settlement Notice in this case meets the required standard. Its level of detail apprises the class members of the salient terms of the settlement and affords them a reasonable opportunity to present any objections. *See Milken*, 150 F.R.D. 57 at 60. Moreover, it is by design "only a summary of the litigation and of the proposed settlement," and it incorporates by reference all remaining documents on file with this Court. (Settlement Notice at ¶ 73.) Accordingly, the Notice of Settlement is fair and is approved.

### C. *The Proposed Settlement is Fair, Reasonable and Adequate*

Fed.R.Civ.P. 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court." The decision to grant or deny such approval lies squarely within the discretion of the trial court, *see In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1368 (2d Cir.1991); *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir.1972), and this discretion should be exercised in light of the general judicial policy favoring settlement. *Weinberger*, 698 F.2d at 73; *In re Michael Milken & Assoc. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y.1993); *Chatelain v. Prudential–Bache Sec., Inc.*, 805 F.Supp. 209, 212 (S.D.N.Y.1992). Ultimately, the Court, as protector of the interests of absent class members, must determine whether the proposed settlement is "fair, reasonable and adequate." *Weinberger*, 698 F.2d at 73; *Malchman* 706 F.2d at 433.

This determination "involves consideration of two types of evidence." *Weinberger*, 698 F.2d at 73; *Women in City Gov't United v. City of New York*, No. 75 Civ. 2868(MJL), 1989 WL 153059 at *4 (S.D.N.Y. Dec. 13,

1989). The Court's primary concern is with "the substantive terms of the settlement compared to the likely result of a trial," *Malchman*, 706 F.2d at 433, and to that end "the trial judge must 'apprise[ ] himself of all the facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim[s] be litigated.'" *Weinberger*, 698 F.2d at 74 (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968)).

The Court's second concern is with "the negotiating process by which the settlement was reached," *Weinberger*, 698 F.2d at 73, which must be examined "in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves." *Malchman*, 706 F.2d at 433 (citing *Weinberger*, 698 F.2d at 73). The Court has a fiduciary duty to ensure that the settlement is not the product of collusion. *In re Warner Communications Securities Litigation*, 798 F.2d 35, 37 (2d Cir.1986). So long as the integrity of the arm's length negotiation process is preserved, however, a strong initial presumption of fairness attaches to the proposed settlement, *Chatelain*, 805 F.Supp. at 212 (citing *Ross v. A.H. Robins Co., Inc.*, 700 F.Supp. 682, 683 (S.D.N.Y. 1988)), and "great weight" is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation. *Id.* (citing *Cannon v. Texas Gulf Sulphur Co.*, 55 F.R.D. 308 (S.D.N.Y.1972)).

### (1) *Substantive Fairness: The Grinnell Factors*

The analytical framework for evaluating the substantive fairness of a class-action settlement was set forth by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974), more than two decades ago, and is now well established. In determining whether to approve a proposed Settlement a district court should consider the following nine factors:

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.

*Id.* at 463 (internal citations omitted). In its consideration of these factors, "[t]he Court must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Id.* at 462. As discussed below, the facts in this case satisfy the elements of the *Grinnell* test and support approval of the Settlement.

### (a) *The Complexity, Expense and Likely Duration of the Litigation.*

"Avoiding wasteful litigation and expense are factors which 'lay behind the Congressional infusion of a power to compromise.'" *Milken*, 150 F.R.D. 46 at 55 (citing *Florida Trailer and Equip. Co. v. Deal*, 284 F.2d 567, 571 (5th Cir.1960)). Accordingly, this Court must consider the complexity, expense and likely duration of the litigations that the parties seek to avoid. This factor weighs heavily in favor of the proposed Settlement. The legal and factual issues presented in both the Federal and Texas Actions are complex, and would, if litigated, require substantial expenditures of both private and public resources. The Consolidated Federal Complaint involves 70 partnerships, tens of thousands of potential plaintiffs, and claims arising under RICO, federal securities laws, and state common law. The RICO allegations alone raise such multifaceted issues of fact as whether a pattern exists and whether underlying predicate acts and a RICO injury can be established. *See Prudential*, 1995 WL 798907 at * 11. The Consolidated Texas Petition is similarly complex, involving 23 Partnerships,

thousands of class members, and multiple statutory and common-law claims.

The parties' litigation of these claims during the past nearly 1,000 days has already consumed large sums of money and many thousands of hours of labor. Absent a settlement, these costs will only escalate as a result of discovery proceedings, motion practice, trials, and likely appeals. Such burdensome and protracted litigation would carry with it no guarantee of success for the plaintiff class, and a recovery would in any event be eroded by the costs of prosecuting the action. Accordingly, the first element of the *Grinnell* test supports approval of the proposed Settlement.

### (b) *The Reaction of the Class to the Settlement.*

The second factor to be considered by the Court is the reaction of the Class to the proposed settlement. A favorable reception by the Class constitutes "strong evidence" of the fairness of a proposed settlement and supports judicial approval. *See Grinnell*, 495 F.2d at 462. In particular, "the absence of objectants may itself be taken as evidencing the fairness of a settlement." *Ross v. A.H. Robins*, 700 F.Supp. 682, 684 (S.D.N.Y. 1988) (citing *Weiss v. Drew National Corp.*, 465 F.Supp. 548, 551 (S.D.N.Y.1979)); *see also Torrisi v. Tucson Electric Power Co.*, 8 F.3d 1370, 1378 (9th Cir.1993). As set forth previously in this Opinion, notice of the proposed Settlement was mailed to the entire Class in August of 1996, and summary notice was published in the national editions of *The Wall Street Journal, The New York Times* and *USA Today.* Class Members were thereby informed of all material terms of the Settlement and were apprised of the deadline for filing objections and the date and purpose of the fairness hearing. In response to these notices, only three objections to the substantive terms of the settlement [40] were received from Class Members, two of

which have subsequently been resolved. This is an extremely favorable response, particularly in light of the large size of the Class.[41] Accordingly, as the Class appears to have acquiesced in the Settlement by an overwhelming margin, the second element of the *Grinnell* test is satisfied.

### (c) *The Stage of the Proceedings and the Amount of Discovery Completed.*

The stage of the proceedings and the amount of discovery completed at the time a Settlement is reached is relevant to the parties' knowledge of the strengths and weaknesses of the various claims in the case, and consequently affects the determination of the settlement's fairness. *See Milken*, 150 F.R.D. 46 at 55–56. It is undisputed that extensive discovery took place prior to the commencement of settlement negotiations in October of 1995; that the discovery documents had been analyzed and losses had been calculated for each Partnership prior to the execution of the Memorandum of Understanding in January of 1996; and that a comprehensive evaluation of the facts and merits of each Partnership had been performed prior to the execution of the Settlement Agreement in July of 1996. It is therefore apparent that Class Counsel "has had sufficient information to act intelligently on behalf of the class," *Schwartz v. Novo Industri A/S*, 119 F.R.D. 359, 362 (S.D.N.Y.1988), and accordingly this third element of the *Grinell* test weighs in favor of approval of the Settlement.

### (d) *The Risks of Establishing Liability*

Litigation inherently involves risks. Indeed "[i]f settlement has any purpose at all, it is to avoid a trial on the merits because of the uncertainty of the outcome." *In re Ira Haupt & Co.*, 304 F.Supp. 917, 934 (S.D.N.Y. 1969). In the absence of a settlement in this

---

**40.** As previously noted, objections to the amount of attorneys' fees will be the subject of a separate Order.

**41.** The number of opt-out requests received from class members is normally also taken into account in the determination of a settlement's fairness. *See, e.g., Chatelain*, 805 F.Supp. at 213.

In the present case, however, the number of opt-out requests is not an appropriate factor to consider in the fairness evaluation, because the exclusion deadline—July 21, 1995—expired more than a year before the terms of the proposed settlement were known to the Class Members.

case, substantial litigation risks would exist for the Class at trial.[42]

Importantly, the Class would face serious obstacles to establishing the elements of its claims. The central allegation in the Texas and Federal Actions is that PaineWebber marketed and sold Partnership units to investors on the basis of false or misleading statements. PaineWebber denies making any such misrepresentations, and contends that its prospectuses provided adequate disclosures of risk. PaineWebber further contends that any losses suffered by Class Members were caused not by any fraud on its part, but rather by unforeseeable market downturns.

In order to establish fraud as a common law claim, the Class would have to prove "the hotly contested elements of falsity, materiality, scienter and reliance." *In re Ambase Corp.*, No. 90 Civ.2011(CHS), 1995 WL 619856 at *1 (S.D.N.Y. Oct. 23, 1995). These elements might also be required to establish the Class's RICO claims, which are predicated on alleged acts of mail fraud, wire fraud and fraud in the offer and sale of securities. (Complaint at ¶¶ 179–81, 190–91). See, e.g., *Compania Sud–Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F.Supp. 411, 424 (S.D.N.Y.1992); *Morin v. Trupin,* 711 F.Supp. 97, 105 (S.D.N.Y.1989). But see *Shaw v. Rolex Watch U.S.A., Inc.*, 726 F.Supp. 969, 972 (S.D.N.Y.1989); *GLM Corp. v. Klein*, 684 F.Supp. 1242, 1244–45 (S.D.N.Y.1988). At a minimum, in order to establish the predicate acts of mail or wire fraud for RICO purposes, the Class would have to show that PaineWebber "participated in a scheme to defraud" and evinced a "specific intent to defraud." *See Vapores*, 785 F.Supp. at 424 (citing *U.S. v. Rodolitz*, 786 F.2d 77, 80 (2d Cir.1986) and *U.S. v. Gelb*, 700 F.2d 875, 879 (2d Cir.1983)). Specifically, the Class would have to prove that risky and unprofitable Partnerships were knowingly or recklessly portrayed by PaineWebber

as safe investments; it would not be sufficient merely to show that the Partnerships failed to perform as predicted. *See Olkey v. Hyperion 1999 Term Trust Inc.*, 98 F.3d 2, 9 (2d Cir.1996). In addition, it is uncertain whether the Class would be able to prove the existence of an overarching fraud or cover-up conspiracy, since such a scheme would implicate an enormous number of PaineWebber employees and third parties in offices all over the country, who dealt with tens of thousands of clients over the course of 12 years.

Assuming that the Class could prove predicate acts of fraud as well as the other requirements to establish a substantive violation of 18 U.S.C. § 1962, it still would not have standing to recover treble damages or attorneys' fees under RICO unless it could also show injury and causation. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir.1994). It is possible that no RICO injury will be found to exist here, since "as a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite," and ·in this case most of the Partnerships are still operating and could provide distributions beyond the life of the litigation. *Id.*, 27 F.3d at 768 (relying on *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1104 (2d Cir.1988)).

In addition, even if it could be proven that Class Members were induced to invest in the Partnerships by misrepresentations or omissions on the part of PaineWebber, plaintiffs cannot prevail unless they further prove that any losses suffered by the Class were actually caused by those misrepresentations rather than by external market conditions. A civil RICO suit requires pleading and proof of loss "by reason of" the defendant's violation. 18 U.S.C. § 1964(c). "In the context of predicate acts grounded in fraud," the plaintiff must show that "the misstatements were the reason the transaction turned out to ·be a losing one." *Gelt Funding*, 27 F.3d at 769

---

**42.** It should be noted that when settlement negotiations began, PaineWebber had already announced that it would take a $200 million charge and that it expected to reach a settlement with the SEC regarding Partnership-related claims. Also, the Settlement in this action was concluded nearly six months after the filing of the SEC

Consent Order, which contains extensive findings against the Defendants. However, the SEC Order, by its terms, does not adjudicate the merits of any claims and is not admissible "to prove underlying facts of liability." *U.S. v. Gilbert*, 668 F.2d 94, 97 (2d Cir.1981).

(relying on *Citibank N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992)). Thus, "when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, that same injury cannot be said to have occurred by reason of the defendant's actions." *Id.* (relying on *Brandenburg v. Seidel*, 859 F.2d 1179, 1196 (4th Cir.1988)). Many of the assets owned by the Partnerships in this action arguably were subject to price fluctuations, economic shifts, regulatory and governmental actions, and other factors that PaineWebber could argue were primary or intervening causes of the diminution in Partnership values. *See Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir. 1990); *Porter v. Shearson Lehman Bros., Inc.*, 802 F.Supp. 41, 60 (S.D.Tex.1992); *Platsis v. E.F. Hutton & Co.*, 642 F.Supp. 1277, 1299 (W.D.Mich.1986).

PaineWebber would have at least two potentially strong defenses at trial. First, it would argue that the Prospectuses for certain of the Partnerships in this case carry obvious warnings, i.e., they "bespeak caution," and that investors are therefore charged with knowledge of those warnings and may not rely on oral statements to the contrary. *See Hyperion*, 98 F.3d at 8–9; *Brown v. E.F. Hutton Group Inc.* 991 F.2d 1020, 1032–33 (2d Cir.1993). Class Members, whatever their actual level of sophistication, would be held to a "reasonable investor" standard regarding whether they had been put on notice of investment risks. *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 351 (2d Cir. 1993).

In addition, PaineWebber would undoubtedly raise statute of limitations defenses. The applicable statute of limitations for RICO is four years from the moment when a plaintiff discovers or "should have discovered" the injury. *Rhoades*, 859 F.2d at 1103. "[W]here plaintiffs acquire an interest in a limited partnership in reliance on allegedly fraudulent offering material—the injury . . . is the actual purchase of the partnership

interest." *Ackerman v. Nat'l Property Analysts, Inc.*, 887 F.Supp. 494, 503 (S.D.N.Y. 1992). The plaintiff's duty of inquiry with regard to that injury arises—and the RICO cause of action thereby accrues—when "the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded." *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 76 (S.D.N.Y.1996), (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983)). Here, PaineWebber would likely contend that diminished quarterly distributions and letters sent to Class Members stating that Partnerships would not perform as well as predicted constituted "storm warnings" sufficient to place investors on notice of their injuries and thus start the running of the statute of limitations prior to November 23, 1990. *See Prudential*, 930 F.Supp. at 75. Accordingly, there is a risk that most Class Members[43] are potentially subject to limitations defenses against their RICO claims.[44]

Finally, the Class's ability to prevail at trial would be further hampered by the fact that much of its case will depend on the testimony of witnesses who are employees, agents or affiliates of PaineWebber, and therefore likely to be hostile, as well as on complex expert testimony likely to be contested by PaineWebber's own witnesses. In any event, there can no guarantee of what the jury will conclude. For all of the foregoing reasons, the Class would face substantial risks of establishing liability should this litigation go to trial, and accordingly the fourth element of the *Grinnell* test supports approval of the proposed Settlement.

#### (e) *The Risks of Establishing Damages*

Even if the Class were to prevail on liability against PaineWebber, it would still face substantial risks in proving its damages at trial. "In class actions, the 'complexities of calculating damages increase geometrically.'" *Chatelain*, 805 F.Supp. at 214 (citation omitted). In this action, the plaintiffs' damage claims under tort, contract and RICO

---

**43.** Some investors in 11 of the 70 Partnerships apparently purchased units after November 23, 1990 and would not be vulnerable to a RICO limitations defense. *See* Obj. Mem. at Exh. 7.

**44.** The applicable statute of limitations for common law fraud in this case may also be subject to equitable tolling. *See Weisl v. Polaris Holding Co.*, 226 A.D.2d 286, 641 N.Y.S.2d 288, 289 (1st Dep't 1996).

depend in large part on calculations of residual values for each of the nonliquidated Partnerships, and those calculations are driven in turn by speculative projections of future earnings. At trial, PaineWebber would most likely present evidence of higher earning projections for each Partnership, which would correlate to higher residual values and thus lower damages. The issue would undoubtedly devolve into a battle of experts whose outcome cannot be accurately ascertained in advance.

With regard to the Class's RICO claim, there is a substantial risk that the Class would be limited to out of pocket damages, since New York law precludes the recovery of lost profits in fraud actions, and the RICO claim in this case is predicated on fraud. *See First Nationwide Bank v. Gelt Funding Corp.*, 820 F.Supp. 89, 95 (S.D.N.Y.1993) (relying on *AFA Protective Sys., Inc. v. A.T. & T. Co.*, 57 N.Y.2d 912, 456 N.Y.S.2d 757, 442 N.E.2d 1268 (1982)); *Ostano Commerzanstalt v. Telewide Sys., Inc.*, 794 F.2d 763, 766 (2d Cir.1986). Moreover, as previously noted, there is authority in this Circuit that RICO damages cannot be definitively calculated or recovered while the Partnerships continue to operate and generate distributions. *Gelt Funding*, 27 F.3d at 768–69. With regard to contract damages, Class Members would bear the risk of establishing lost profits with reasonable specificity based on the promised returns for each Partnership. Finally, damages are a matter for the jury, whose determinations can never be predicted with certainty. For all of these reasons, proving damages would be a lengthy, time-consuming and ultimately uncertain process, and accordingly this element of the *Grinnell* test weighs in favor of approval of the proposed Settlement.

### (f) The Risks of Maintaining the Classes Through the Trial.

As previously noted, the Federal and Texas Classes were certified in 1995. While the certification of the Texas Class has not been challenged, the structure of the Federal Class and the adequacy of Class Counsel's representation have already been the subject of two motions and an appeal to the Second Circuit. The fairness and adequacy of the Federal Class has been affirmed by this Court in its Order dated February 26, 1996 as well as in this Opinion. Nevertheless, in the absence of a settlement of these actions, there can be no guarantee that the Jacobsons or other objectors will not continue to challenge the maintenance of the Classes as certified. Accordingly, this element of the *Grinnell* test weighs in favor of approval of the Settlement.

### (g) The Ability of the Defendants to Withstand a Greater Judgment.

The ability of the defendant to pay a judgment greater than the amount offered in a settlement can be relevant to the Court's determination of the Settlement's fairness. In particular, evidence that the defendant will not be able to pay a larger award at trial tends to weigh in favor of approval of a settlement, since the "prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures." *In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 746 (S.D.N.Y.1985) (quoting *City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380, 1389 (S.D.N.Y.1972)). However, the converse is not necessarily true; i.e., the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate. Regardless of whether one looks at PaineWebber's total equity of § 1.6 billion—as the Jacobsons maintain—or at its "excess net capital" of approximately $350 million—as Class Counsel contends—Paine-Webber has the ability to withstand a judgment in this action of greater than $200 million. (*See* Obj. Supp. Mem. at 17 n. 12; Class Men. at 45.) Accordingly, this element of the *Grinnell* test weighs neither for nor against approval of the Settlement.

### (h, i) The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of All the Attendant Risks of Litigation.

Fundamental to analyzing a settlement's fairness is "the need to compare the terms of the compromise with the likely rewards of litigation." *Weinberger*, 698 F.2d at 73 (cit-

ing *TMT Trailer Ferry*, 390 U.S. at 424–25, 88 S.Ct. at 1163). This determination "is not susceptible of a mathematical equation yielding a particularized sum," but turns on whether the settlement falls within "a range of reasonableness." *Milken*, 150 F.R.D. 57 at 66 (citing *Newman*, 464 F.2d at 693.) The adequacy of the amount offered in settlement must be judged "not in comparison with the best possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of the plaintiffs' case." *In re "Agent Orange" Prod, Liab. Litig.*, 597 F.Supp. 740, 762 (E.D.N.Y.1984) (citing *Grinnell*, 495 F.2d at 455). However, as noted above, it is not necessary in making this determination for the Court "to try the case which is before it for settlement," since such a procedure "would emasculate the very purpose for which settlements are made." *Grinnell*, 495 F.2d at 462. Rather, the Court is called upon "to consider and weigh the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Id.*

The size of the largest possible recovery in this action is speculative and can only be estimated in the most general terms. The Class's capital investment in the Partnerships equals approximately $2.3 billion, of which roughly $1.46 billion has already been returned to Class Members through cash distributions. Although the parties contend that the aggregate value remaining in the unliquidated Partnerships is approximately $600 million, in order to make a conservative estimate of remaining values, the Court will assume that only half of the amount claimed, or $300 million, is valid.

The Class would seek compensatory damages at trial under tort theories, which would compensate the plaintiffs for their lost investment, less distributions and remaining value. Based on the figures set forth above, the amount of that loss is approximately $540 million. In addition, prejudgment interest would be assessed at 9% in accordance with New York C.P.L.R. §§ 5001(a) and 5004, starting from a range of possible dates extending back into the mid–1980's, (*See* Class Mem. Data App. at Exh. B, § 1), or, if neces-

sary for ease of administration, a single designated point such as the date of the filing of this action. *See* N.Y. CPLR § 5001(b); *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir.1994); *In re Crazy Eddie Sec. Litig.*, 948 F.Supp. 1154, 1167 (E.D.N.Y.1996). Depending on what that starting date is determined to be, tort damages at trial would likely reach $1 billion and conceivably could rise as high as approximately $3 billion.

In the alternative, the Class seeks rescission damages, which would equal Class Members' lost investments, plus interest, minus distributions, without regard to any remaining value in the Partnerships. Because the remaining values of the Partnerships are assumed here to be relatively low, however, rescission damages would not be significantly different from the estimate for tort damages.

The Class also seeks treble damages pursuant to RICO. Since RICO plaintiffs are entitled to damages proximately caused by the alleged predicate acts, *American Nat'l Bank and Trust Co. v. Haroco, Inc.*, 473 U.S. 606, 608–9, 105 S.Ct. 3291, 3291–92, 87 L.Ed.2d 437 (1985), and the predicate acts in this case are of fraud, the Class's RICO damages would involve the same basic calculations as for its fraud claim, *see Crazy Eddie*, 948 F.Supp. at 1167, but with a sharply decreased likelihood of an award of prejudgment interest. *See Abou–Khadra v. Mahshie*, 4 F.3d 1071, 1083 (2d Cir.1993); *Wickham Contracting Co. v. Local Union No. 3, IBEW*, 955 F.2d 831, 834 (2d Cir.1992); *Bingham v. Zolt*, 810 F.Supp. 100, 101–102 (S.D.N.Y.1993); *Crazy Eddie*, 948 F.Supp. at 1166; *Nu–Life Construction Corp. v. Board of Educ. of the City of N.Y.*, 789 F.Supp. 103, 105 (E.D.N.Y.1992). Accordingly, the Class's foreseeable RICO recovery, inclusive of trebling, would likely be less than $2 billion.

Finally, the Class also seeks to recover contract damages on the theory that Paine-Webber promised to produce particular annual returns to Partnership investors. Assuming that such a contractual duty could be proven, Class Members would be entitled to recover the benefit of their bargains, but such damages are too speculative to be estimated for the purposes of assessing the fairness of this Settlement.

Thus, the most optimistic estimates of the Class's recovery would range between approximately $1 billion and an upper limit of approximately $3 billion. The cash portion alone of the proposed Settlement, which will return $125 million to Class Members, represents between 4% and 12.5% of Defendants' exposure, and with the Additional Benefits, the Settlement recovery increases to between 7% and 20% of the most generous forecasts of recovery. Class Members in virtually all of the Partnerships are expected to recover at least 50%, and in some instances up to 100%, of their original investments—a very favorable result. (*See* Class Mem. at 46.) *See also Prudential,* 1995 WL 798907 at *15.

However, the dollar amount of the settlement by itself is not decisive in the fairness determination, and the fact that the settlement fund may equal only a fraction of the potential recovery at trial does not render the settlement inadequate. "In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell,* 495 F.2d at 455 n. 2. Naturally, the settlement does not provide for a full recovery of legal damages; but that is the hallmark of compromise. Given the very considerable litigation risks that would be faced by the Class at trial, the amount of the settlement cash fund is very much within the "range of reasonableness" required for judicial approval.

The Jacobsons further contend that the settlement is unfair because it treats different Class Members differently with regard to the Additional Benefits. However, "there is no rule that settlements benefit all class members equally," *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1396, 1411 (E.D.N.Y.1985) (citing *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1148 (11th Cir.1983)), as long as the settlement terms are "rationally based on legitimate considerations." *Id.* The record in this action indicates that the Additional Benefits were not arbitrarily assigned, but rather were the direct result of negotiations between Class Counsel and PaineWebber. Specifically, in those Partnerships where

PaineWebber would continue to control the operations, PaineWebber was willing to assume more risk in the form of the Remaining Value Guarantees. (*See* Class Mem. at 54; Chimicles Aff. at ¶ 73.) By working to maximize the performance and distributions of these Partnerships, PaineWebber would be able to avoid making cash payouts later. The risk that PaineWebber was willing to assume in the Par Guarantees was a function of the asset composition of each Par Guarantee Partnership. (*Id.*) For the Geodyne Partnerships, where PaineWebber no longer has any control or economic interest, Remaining Value and Par guarantees were not offered, although PaineWebber assumed some risk in the form of price guarantees. (*Id.*) A settlement requires compromises by both sides, and it is not unreasonable for concessions to have been made to PaineWebber's interests in this way.

As noted above, the applicable standard for approval is whether the settlement is fair, reasonable and adequate, not whether it is perfect, or whether every Class Member receives an identical recovery. The guiding principle of this settlement is to return as much lost investment as possible to all Class Members, and the Additional Benefits contribute to that goal. Moreover, Class Members get a second bite at the apple in the Look–Back Fund, which is distributed among all plaintiffs who still have Recognized Loss following the payment of the Additional Benefits, further mitigating any potential inequalities. Indeed, the assignment of Additional Benefits may actually produce yet a fairer result, since the settlement fund is otherwise allocated on a straight pro rata basis without consideration of any differences between Partnerships. (*See* Settlement Notice at ¶¶ 24–41.)

Finally, the Pegasus investors do quite well under the Additional Benefits; their par guarantees (albeit capped for Pegasus II) are a very favorable benefit compared to most other investors. If they ultimately receive a relatively small cash recovery through these guarantees (or via the cash fund), it will be because their investments have retained more value than others, or because they will already have received higher cash distribu-

tions than other investors as of December 31, 2000.

For all of these reasons, the proposed Settlement is well within the range of reasonableness in light of the best recovery at trial and all the attendant risks of litigation, and accordingly the final elements of the *Grinnell* test weigh heavily in favor of approval.

### (2) *Procedural Integrity*

The second fundamental indicator of a settlement's fairness is the fact that it was properly negotiated at arm's length by the Parties. As long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides. Accordingly, the Court has an obligation to satisfy itself that the settlement process has not been corrupted and that the Class Members have been adequately represented by qualified counsel. *See Weinberger,* 698 F.2d at 74; *Malchman,* 706 F.2d at 433; *Chatelain,* 805 F.Supp. at 212. The Jacobsons assert that Class Counsel's representation of the Class was not adequate in this case, and they further suggest that collusion may have occurred between the Parties.

The first of these contentions is rejected for the reasons set forth *supra* in Section A of this Part. As for their second allegation, the Jacobsons contend that the negotiation process was undermined by the alignment of Class Counsel's interests with those of Paine-Webber to resolve this case quickly and to roll up as many claims as possible in the Settlement. If proven, such collusion might prevent the approval of the Settlement, and at the very least would raise the Court's scrutiny and rebut the presumption of deference to the recommendations of counsel.

However, an allegation of collusion will not stand in the absence of any credible evidence. *See, e.g., Smith v. Alleghany Corp.,* 394 F.2d 381, 391–92 (2d Cir.1968). The Jacobsons have had every opportunity over the last eighteen months to develop the facts supporting their theory. They have obtained discovery documents from Class Counsel, they have filed numerous submissions—both in support of their present objection and in

connection with two previous related motions—and they have appeared before this Court on at least five occasions, including at the fairness hearing. Nevertheless, they have mustered only the weakest of circumstantial evidence of any possible collusion between Paine Webber and Class Counsel. In particular, the testimony at the fairness hearing of the Jacobson's witness, Professor Koniak, added virtually nothing to the record to indicate that any improper behavior actually occurred in this case or that the integrity of the settlement negotiation process was corrupted in any way.

Indeed, Professor Koniak's testimony suggested that any class certification is collusive if it is conditional or stipulated to by the Parties, a position which is obviously untenable. Nor is the Court swayed by the Jacobsons' argument that the settlement must be collusive because it does not return an adequate recovery to Pegasus investors. Accordingly, as there is no credible evidence that the integrity of the negotiating process was impaired, this Court finds that the Settlement was achieved at arm's length.

For all of the aforementioned reasons, the proposed Settlement is fair, reasonable and adequate, and is found to be in the best interests of the Class.

### D. *The Plan of Allocation is Fair and Reasonable*

■ The Court's responsibility for ensuring that the proposed Settlement is equitably allocated among Class Members derives from the requirement of Rule 23(e) that the settlement of a class action have court approval, and the standard of fairness, adequacy and reasonableness "applies with as much force to the review of the allocation [plan] as it does to the review of the overall settlement.' " *Agent Orange,* 611 F.Supp. at 1402 (E.D.N.Y.1985) (citing *In re Chicken Antitrust Litig. Am. Poultry,* 669 F.2d 228, 238 (5th Cir.1982)). The review of the plan of allocation is squarely within the discretion of the district court, *In re Equity Funding Corporation of America Securities Litigation,* 603 F.2d 1353, 1362 (9th Cir.1979); *State of West Virginia v. Pfizer & Co.,* 440

F.2d 1079, 1085 (2d Cir.1971), and in this function—as in its review of the settlement itself—the Court acts as the fiduciary of all Class Members. This role is especially important where, as here, Class Members were required to bind themselves to the Class before the terms of any Settlement had been determined.

The Jacobsons object to the Plan of Allocation on the ground that it does not account for variations in the strengths of different Class Members' claims. At a minimum, it is obvious that in the case of a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision. To determine precisely "the distribution of the settlement fund among the myriad claimants" in such a class would require counsel or the district court "to weigh the strengths and weaknesses of the claims of each class member" and would be an "almost impossible task." *Equity Funding*, 603 F.2d at 1365 (9th Cir.1979); *see also In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 219 (5th Cir.1981). In such cases, the requirements of efficiency and administrability "undoubtedly would permit alternative methods of disbursement." *Agent Orange*, 611 F.Supp. at 1403; *see also Women in City Gov't*, 1989 WL 153059 at *5.

However, it is also true that when real and cognizable differences exist between the "likelihood of ultimate success" for different plaintiffs, "it is appropriate to weigh 'distribution of the settlement ... in favor of plaintiffs whose claims comprise the set' that was more likely to succeed." *Agent Orange*, 611 F.Supp. at 1411 (citing *Corrugated Container*, 643 F.2d at 220). Such merit-based weighting has been approved by courts in this Circuit and elsewhere where substantially different or additional claims have been asserted by certain class members and not

others (*see Agent Orange*, 611 F.Supp. at 1410–11;) *In re Salomon Inc. Sec. Litig.*, No. 91 Civ. 5442(RPP), 1994 WL 265917 at *6–7 (S.D.N.Y. June 16, 1994); where the liability of a defendant has been altered in relation to some class members because of a separate settlement or judicial determination (*Equity Funding*, 603 F.2d at 1363–67; *In re Investors Funding Corp. of N.Y. Sec. Litig.*, 9 B.R. 962, 965 (S.D.N.Y.1981); *Milken*, 150 F.R.D. 46 at 50–51); where different plaintiffs have "substantially" different vulnerabilities to statute of limitations defenses (*see Corrugated Container*, 643 F.2d at 220; *see Prudential*, 1995 WL 798907 at * 11); and where the injuries claimed by different class members have been sustained under significantly different legal or factual circumstances (*see, e.g., Women in City Gov't*, 1989 WL 153059 at *4; *Dunn v. H.K. Porter Co.*, 78 F.R.D. 50, 53 (E.D.Pa.1978); *Cagan v. Anchor Savings Bank*, No. CV–88–3024, 1990 WL 73423 at *4 (E.D.N.Y. May 22, 1990); *Salomon* 1994 WL 265917 at *12; *Prudential*, 1995 WL 798907 at * 11; *Investors Funding*, 9 B.R. at 965). As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information. *See Corrugated Container*, 643 F.2d at 219–20; *Milken*, 150 F.R.D. 46 at 55; *Dunn*, 78 F.R.D. at 53–54.

Class Counsel has performed a thorough and detailed analysis of the merits of all the claims in this case. The Executive Committee performed initial calculations of losses for each Partnership in late 1995, and more importantly, throughout the allocation process in early 1996, each Partnership group was represented by a separate law firm and by outside experts.[45] Specifically, the Pegasus investors were represented by the firm of Goodkind Labaton Rudoff & Sucharow, and the merits of the Pegasus claims were re-

---

**45.** At a hearing before this Court on January 19, 1996 regarding the Jacobsons' motion to create a subclass, Class Counsel described the structure of the Allocation Committee as follows:

Mr. Labaton's firm represents Pegasus. He sits on the committee representing the Pegasus experts. Miss Rodriguez's firm represents the real estate partnerships. They have retained a real estate expert [Vitola] ... Mr. Bert Finkel-

stein [and Texas Counsel] represent the Geodyne partnerships exclusively, and they have retained experts in that field. Bernstein Liebowitz represents the R & D Partnerships ... Therefore, each of those firms has now been given its own mandate to represent its client ... and get as much as they can for their partnerships.
(Tr. 1/19/96 at 28.)

viewed and analyzed by two independent experts, i.e., Prof. Jordan and Mr. Treitel. (*See* Tr. 1/19/96 at 23–24.) Reports by each Partnership team were presented to the Allocation Committee, and the conclusions of those reports are set forth in the record. (*See* Compendium of Affidavits and Reports of Experts Retained by Class Counsel in Support of Settlement and Plan of Allocation, Exh. 1–8; Chimicles Aff. at ¶¶ 62–65.)

The dispositive question, therefore, is whether Class Counsel's decision in this case to allocate the settlement fund on a pro rata basis was fair and reasonable in light of the information collected and the analyses performed. Class Counsel assert that the plan should be approved because although the claims of all Class Members are not identical, their similarities greatly outweigh any differences, and every Class Member would have a comparable chance of success on the merits at trial. In other words, it is contended that the Plan of Allocation is indeed "based on a rational analysis of the relative strengths and weaknesses of the claims related to each of the Partnerships," *Prudential,* 1995 WL 798907 at * 19, but that the appropriate weighting of the plan in this case in fact is no weighting at all.[46] The Jacobsons contend that this is an unreasonable result, because certain plaintiffs, and in particular the Pegasus investors, have stronger claims than others on the facts and with regard to statute of limitations defenses.

With regard to the facts, the Jacobsons allege that Pegasus I and II units were marketed pursuant to a unique and uniform "sales pitch" which was orchestrated by PaineWebber's Direct Investment Department and which involved misrepresentations not involved in the marketing of other Partnerships. The Jacobsons also contend that Pegasus investors have a stronger litigation position because the SEC's Consent Order made specific findings with regard to Paine-Webber's marketing and sale of Pegasus units.

These arguments are unpersuasive. As previously set forth in this Court's Order of February 26, 1996 as well as here, the claims asserted by all Class Members in the Consolidated Complaint are materially the same. In every case there are allegations of Uniform Sales Materials and scripts and of centralized fraud and conspiracy by Paine-Webber. (Order dated Feb. 26, 1996 at 4–5.) Furthermore, the Allocation Committee analyzed the merits of all claims and found evidence of similar illegal activity by Paine-Webber in every Partnership group. (*See* Chimicles Aff. at ¶¶ 62–65.) Based on these findings, it was reasonable for Class Counsel to conclude that all plaintiffs would have generally comparable odds of prevailing at trial and that any differences between their claims are not appreciable compared to their similarities. The fact that certain Partnerships were discussed in the SEC's Consent Order does not alter this result, since, as previously noted, the SEC Order is not admissible at trial to prove liability.

With regard to statutes of limitations, the Jacobsons contend that the Plan of Allocation fails to account for different levels of risk faced by different Class Members. Class Counsel asserts that no sufficient basis exists for differentiating between Class Members, because all RICO claims and certain state law claims are subject to the doctrine of "equitable tolling" and could be timely depending on when Class Members discovered or should have discovered their injuries. It is sufficient to state that the determination of when such notice occurred for various Class Members is a question to be resolved by motion or at trial, *see Prudential,* 930 F.Supp. at 75–76; *Butala v. Agashiwala,* 916 F.Supp. 314, 318 (S.D.N.Y.1996), as would be such issues as whether the damages suffered are sufficiently definite to constitute a RICO injury and start the limitations clock. *See Bingham,* 66 F.3d at 561; *Gelt Funding,* 27 F.3d at 768; *Cruden v. Bank of N.Y.,* 957 F.2d 961, 977–78 (2d Cir.1992). In its role as arbiter of the fairness of the proposed Settlement, this Court is not called upon to determine these statute of limitations issues. Indeed, settlements are reached precisely to

---

**46.** The Executive Committee is no stranger to the process of weighting an allocation plan; many of its member firms were involved in the creation of

such plans in other class action settlements. *See, e.g,, Prudential,* 1995 WL 798907; *Milken,* 150 F.R.D. 57; *Investors Funding,* 9 B.R. 962.

avoid such binding judicial determinations. The existence of these unresolved issues is sufficient to support the reasonableness of the Parties' determination that "no distinction should be made between or among Partnerships based on statute of limitations grounds" for the purposes of the proposed Settlement.[47]

This Court's review of the proposed Plan of Allocation is informed not only by the goal of matching each plaintiffs recovery to the strength of his or her claim, *Grinnell,* 495 F.2d at 455, but also "by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *Chicken Antitrust,* 669 F.2d at 238. Efficiency, ease of administration and conservation of public and private resources are highly relevant to the reasonableness of a settlement, *see Women in City Gov't,* 1989 WL 153059 at *5 (citing *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 145, 183), particularly where, as here, the issues are complex, the outcome of the litigation unclear, and the class large. Based on the extensive record in this case, a pro rata distribution of the Settlement on the basis of Recognized Loss will provide a straightforward and equitable nexus for allocation and will avoid a costly, speculative and bootless comparison of the merits of the Class Members' claims. Accordingly, the Plan of Allocation is fair and reasonable and is approved.

### III.

### CONCLUSION

For all of the foregoing reasons, the Court concludes that the proposed Settlement and the proposed Plan of Allocation are fair, reasonable and adequate, and are in the best interests of the Class. Accordingly, all objections are overruled, the present motion is GRANTED, and the settlement of this class action is hereby APPROVED pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

---

**47.** In this regard, it bears noting that the Geodyne plaintiffs, many of whose claims are subject to the fewest statute of limitations defenses, have

1. The Settlement Agreement is fair, reasonable and adequate and is in the best interests of the Class.

2. The Settlement Agreement shall have the full force and effect of an Order of this Court and shall be implemented in accordance with its terms and provisions.

3. The "Settled Claims" as defined in the Settlement Agreement are dismissed on the merits and with prejudice.

4. The Clerk of Court is directed to enter judgment dismissing the Consolidated Complaint with prejudice in favor of the Settling Defendants.

5. This Court retains exclusive jurisdiction over the Parties and Class Members for all matters relating to this litigation, including the award of attorneys' fees and costs, and the administration, interpretation and enforcement of this Opinion and Order.

SO ORDERED.

---

not objected to a pro rata allocation of the Settlement.